**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| STANT PARENT CORP., *et al.*,[1] | Case No. 09-13647 ( ) |
| Debtors. | (Joint Administration Pending) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID
PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II)
SCHEDULING A HEARING TO CONSIDER THE SALE; (III) APPROVING THE
FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (IV) ESTABLISHING
PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (V)
GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS
OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE
OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND SALE AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"**)

hereby move the Court (the **"Motion"**), pursuant to sections 105(a), 363, and 365 of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the **"Bankruptcy Code"**), and Rules 2002,

6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**)

for entry of two orders: (a) one, substantially in the form annexed hereto as <u>Exhibit A</u> (the **"Bid

Procedures Order"**), (i) approving the procedures (the **"Bid Procedures"**) substantially in the

form annexed hereto as <u>Exhibit B</u>, including the Expenses Reimbursement as defined herein and

in the asset purchase agreement (the **"Agreement"**) between the Debtors and Vapor Acquisition

Corp. (the **"Stalking Horse Purchaser"**), with respect to the proposed sale (the **"Sale"**) of

substantially all of the assets (as discussed in greater detail below, the **"Acquired Assets"**), (ii)

---

[1] The Debtors are the following entities: Stant Parent Corp. (7606), Stant Holding Corp. (2025), Stant Corporation
(8429), Stant Manufacturing, Inc. (4059), Standard-Thomson Corporation (5751) and Thomson International
Corporation (5448).

scheduling a hearing (the **"Sale Hearing"**) on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the **"Auction"**), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the **"Assumed Agreements"**); and (v) granting related relief; and (b) a second order, substantially in the form annexed hereto as Exhibit C (the **"Sale Order"**), (i) authorizing the sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, a copy of which is attached hereto as Exhibit D, (ii) authorizing and approving the Agreement, (iii) authorizing the assumption and sale of the Assumed Contracts, and (iv) granting related relief. In support of this Motion, the Debtors rely upon the First Day Declaration (as such term is defined herein), and respectfully state as follows:

## BACKGROUND

1. On the date hereof (the **"Petition Date"**), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the **"Cases"**). The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not yet been appointed in these Cases.

2. The Debtors and their non-debtor affiliates are a leading, integrated manufacturer of highly engineered fluid systems for the global automotive and industrial original equipment manufacturing (**"OEM"**) markets and automotive aftermarket. The Debtors are private entities incorporated in Delaware. The Debtors maintain their global operational and manufacturing headquarters in Connersville, Indiana. They also operate a manufacturing facility in Pine Bluff,

*NY 239,657,605v8*

Arkansas, maintain a sales office in Troy, Michigan and operate facilities abroad through their non-debtor affiliates.

3. A more detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these Cases, is fully set forth in the *Declaration of Philip Fitzpatrick in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## A. The Debtors' Prepetition Capital Structure

4. On or about June 18, 2008, Stant Holding Corp. ("**Stant Holding**"), Stant Corporation ("**Stant**"), Standard-Thomson Corporation ("**STC**"), Thomson International Corporation ("**Thomson**"), Stant Manufacturing, Inc. ("**Stant Manufacturing**"); and together with Stant Holding, Stant, STC and Thomson, individually, each a "Borrower," and collectively, the ("**Borrowers**"), Stant Parent Corp., as guarantor, and GMAC Commercial Finance LLC, as agent, sole lead arranger as a lender (the "**Senior Prepetition Agent**") and certain lenders (together with the Senior Prepetition Agent, the "**Senior Prepetition Lenders**") entered into that certain Loan and Security Agreement (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted hereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, refinancings, refundings or replacements of or to the arrangements provided in such Loan and Security Agreement), pursuant to which, *inter alia*, the Senior Prepetition Lenders agreed to make, certain loans and financial accommodations to the Borrowers in the aggregate principal amount of up to $70,000,000, comprised of a revolving credit facility in the principal amount of up to $30,000,000 (including a swingline loan), and a term loan facility in the principal amount of $40,000,000 (collectively, the "**Senior Prepetition**

NY 239,657,605v8

Loans"), which Senior Prepetition Loans are secured by a first priority lien on, and security interest in, the Prepetition Collateral set forth in the documents evidencing the Senior Prepetition Loans (the **"Prepetition Collateral"**). Approximately $61,901,487.61 (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities), plus (i) outstanding letter of credit exposure, plus (ii) other fees, costs, expenses and indemnities as provided for in the Pre-Petition Agreements was outstanding under the Pre-Petition Agreement as of the Petition Date

5.     On or about June 18, 2008, the Borrowers, Stant Parent Corp., as guarantor, and Northstar Mezzanine Partners V L.P. (**"Northstar"**) entered into a Note Purchase Agreement, pursuant to which the Borrowers issued and delivered to Northstar one or more notes dated as of the date thereof (collectively, the **"Junior Prepetition Notes"**) in an aggregate principal amount of Twenty-Three Million Dollars $23,000,000. The Junior Prepetition Notes are allegedly secured by a second lien on, and security interest in, the Prepetition Collateral. Approximately $25,218,778.71 was outstanding under the Junior Prepetition Notes as of July 22, 2009.

6.     On or about June 18, 2008, the Senior Prepetition Agent and Northstar entered into a Subordination and Intercreditor Agreement (the **"Intercreditor Agreement"**), which sets forth the respective rights and obligations of the Debtors' secured lenders, including, *inter alia*, the priority of payment to such lenders, and, in the event of a bankruptcy proceeding by Stant, Northstar's agreement that it would:

(i)     not object to, contest or oppose (or cause or support any other person in objecting to, contesting or opposing), and waives any right to object to, contest or oppose, any sale, transfer or other disposition of all or any part of the [Prepetition] Collateral free and clear of liens or other claims of [Northstar] under Section 363 of the Bankruptcy Code or any other law applicable to such proceeding if the Senior Prepetition Lenders have consented to or not otherwise opposed such sale, transfer or disposition;

(ii)     (A) not challenge, contest or otherwise object to (or support any other person in challenging, contesting or otherwise objecting to) in any manner (1) any use of cash collateral or debtor-in-

4

possession financing under Sections 363 or 364 of the Bankruptcy Code or otherwise that is consented to or provided by any Senior [Prepetition] Lender, (2) any request by any Senior [Prepetition] Lender for "adequate protection" under Sections 361, 362, 363 or 364 of the Bankruptcy Code (or its equivalent) or (3) any objection by any Senior [Prepetition] Lender to any motion, relief, action or proceeding based on any Senior [Prepetition] Lender's claim of lack of adequate protection; provided, however, that [Northstar] may retain its [l]ien on its [Prepetition] Collateral that was otherwise permitted by [the Intercreditor Agreement] with the same priority as existed prior to the commencement of such proceeding, but subject in all respects to the terms of [the Intercreditor Agreement], and (B) subordinate its [l]iens in the [Prepetition] Collateral to the [l]iens securing such DIP [f]inancing (and all [o]bligations relating thereto), to the extent the [l]iens securing the Senior [Prepetition Loans] are subordinated to or pari passu with such DIP [f]inancing;

(iii)   not assert (or cause or support any other Person in asserting) in any manner any right it may have to adequate protection of its interest in any [Prepetition] Collateral or to post-petition interest, absent written consent or direction of Senior [Prepetition] Agent on behalf of the Senior [Prepetition] Lenders....

Intercreditor Agreement Sections 2.4(b)(i), (ii) and (iii).

**B.    Sale is Necessary to Continue Business**

7.      A variety of external factors have led to a decline in the Debtors' operating performance.  These factors include a dramatic downturn in the global economy, unprecedented volatility in the global credit markets and a steep decline in domestic and foreign auto sales. Approximately half of the Debtors' business is dependent on the domestic auto industry.  It is without question that the North American automotive industry is in a period of dramatic turmoil. The industry is face with significant volume decreases, the move from trucks and SUVs to small cars, increases in raw material prices, supplier/customer friction, weak credit markets, a considerable drop in consumer confidence, a dramatic deterioration in financing available for new vehicles, and financial stress for the "Big Three" which resulted in discontinuation of multiple brand names and/or product lines coupled with a dramatic reduction in dealership

NY 239,657,605v8

distribution channels throughout the United States. The automotive parts market in which the Debtors compete is directly correlated with the automotive industry as a whole. In 2003, approximately 17 million cars and light trucks were produced in North America. In 2008, approximately 12.6 million cars and light trucks were produced in North America. Current estimates for 2009 suggest production of a mere 8-million units for the year.

8.     In addition to the severe downturns in the global economy and the auto industry, a few company-specific factors have created challenges as well. Prior to the acquisition led by investors H.I.G. Stant IV, LLC, Vapour Investors, LLC and Stant Partners Ltd., the Debtors had not operated as a stand-alone business for some time and lacked some of the required controls that would be typical of a stand-alone company of its size. Therefore, the consequent pricing, contract and budgeting errors contributed to the Debtors' inability to achieve its EBITDA expectations. Additionally, the Debtors have lost some of their key existing customers and new customer projects as a result of technical issues and the acquisition of one of the Debtors' customers, whose acquirer decided to displace the Debtors with an incumbent supplier.

9.     Even with the success in reducing fixed costs and improving financial controls, the Debtors have not been able to generate sufficient cash flows to meet their continuing obligations. In light of the continued global economic instability, including the unique financial difficulties currently faced by the Big Three United States automakers, the Debtors' Board of Directors (the **"Board"**) engaged in a series of extensive negotiations with the various parties in its capital structure to restructure the Debtors' balance sheet. The objective of the negotiations was to attain and implement a capital structure that would provide the short term liquidity for the Debtors to endure the severe financing environment in the current market and to support the long-term viability of the Company. Despite the Debtors' significant efforts through extensive negotiations with multiple proposals from various constituents, the Debtors were unable to reach

an agreement that met the company's business and financial objectives. The Debtors entered into a forbearance agreement with GMAC, which provided additional liquidity funded by the senior lenders to allow the parties time to come to a negotiated agreement outside of bankruptcy and for the market to recover. However, neither of these goals have been achieved, and this path has not allowed the company to meet its business and financial objectives.

10.     After extensive negotiations with the Debtors' lenders, as described above, a review of various liquidation and sale recovery scenarios and discussions with the Debtors' professionals, the Board ultimately determined in the exercise of its reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents is to seek bankruptcy protection, in order (i) to sell their viable business in an auction conducted under the supervision of the Bankruptcy Court and (ii) to complete a prompt and orderly liquidation of substantially all of the Debtors' assets. The Debtors believe that proceeding under chapter 11 to sell the Debtors' remaining assets will maximize the value of such assets for all stakeholders and reduce potential risks, contingencies and uncertainties in the proposed wind-down. Therefore, after substantial negotiations, the Company, H.I.G. Capital Partners IV, L.P. ("**HIG Capital**") and the Senior Prepetition Agent reached an agreement to fund the Company to allow for a competitive sale process through the sale (the "**DIP Facility**").[2] Given the exigent circumstances, the Debtors desire to proceed with the sale on an expedited basis.

11.     In furtherance of the sale process and in exchange for HIG Capital's economic participation in the DIP Facility, among other things, immediately prior to the Petition Date, the Senior Prepetition Agent and HIG Capital entered into an agreement pursuant to which, the

---

[2] Contemporaneously with the filing of this Motion, the Debtors filed an Emergency Motion of the Debtors for Order (I) Authorizing Continued Secured Postpetition Financing; (II) Granting Senior Liens and Superpriority Administrative Expense Status; (III) Authorizing the Debtors' Use of Cash Collateral.; (IV) Granting Limited Relief from the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief.

Senior Prepetition Agent and the Senior Prepetition Lenders agreed that they would not consent to, finance or accept any bid or other transaction for the Debtors' assets other than the current "stalking horse" bid, unless such alternative transaction provides for cash in full at closing sufficient to pay in full the DIP Facility and the outstanding obligations under the Senior Prepetition Loans. The same agreement also provides that in connection with the proposed stalking horse bid and the assumption of the senior debt by the Stalking Horse Purchaser, the Senior Prepetition Agent and the other Senior Prepetition Lenders will agree to restructure their debt on terms agreed between the Stalking Horse Purchaser, the Senior Pretition Agent and the Senior Prepetition Lenders on the terms set forth in the Agreement and any Ancillary Agreements (as defined in the Agreement).

C.      **The Proposed Sale**

12.      The Debtors and the Stalking Horse Purchaser entered into the Agreement for the sale of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the Sale proceeds. The Stalking Horse Purchaser is an affiliate of both HIG Capital and the majority shareholder of the Debtors.

13.      The sale of the Acquired Assets is the result of negotiations conducted by the Debtors and their counsel, on the one hand, and the Stalking Horse Purchaser and its counsel, on the other hand. The Debtors and the Stalking Horse Purchaser entered into the Agreement immediately prior to the Petition Date.

14.      The following paragraphs in this section summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement.[3]

        a.      Purchase Price. (i) assumption of all amounts due under the DIP Facility, (ii) assumption of the Senior Prepetition Loans, and (iii) the Assumed Liabilities.

---

[3] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Agreement attached hereto as Exhibit D.

b.    <u>Acquired Assets</u>. Substantially all assets and contracts related to the Debtors and their businesses as defined in the Agreement.

c.    <u>Assumed Liabilities</u>. The Buyer will assume and pay, perform or discharge when due or otherwise, certain specified liabilities of the Debtors set forth in the Agreement.

d.    <u>Excluded Assets</u>. The Acquired Assets are the only assets transferred to, or otherwise acquired by the Buyer under the Agreement. Without limiting the generality of the list of Excluded Assets, the Acquired Assets do not involve (i) any right, title or interest of any person other than Debtors in any property or asset, and (ii) the properties and assets described in Section 1.2 of the Agreement.

e.    <u>Excluded Liabilities</u>. Seller shall retain all liabilities and obligations that are not Assumed Liabilities.

f.    <u>Due Diligence</u>. To be completed prior to the Bid Procedures hearing.

g.    <u>Closing and Other Deadlines</u>. Conditional, upon satisfaction of conditions precedent set forth in the Agreement.

## JURISDICTION

15.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

16.    The statutory predicates for the relief sought herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## RELIEF REQUESTED

17.    By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures, including the Expense Reimbursement, with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections for the Assumed and Assigned Agreements, and (v) granting related relief; and (b) the Sale

Order (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, (ii) authorizing and approving the Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (iv) granting related relief.

## PROPOSED BID PROCEDURES

18.     The Debtors believe that it is imperative that they promptly move forward in hope that higher and better offers are generated for the Acquired Assets. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting further active bidding that will result in the highest or best offer for the Acquired Assets while affording appropriate protection to the Stalking Horse Purchaser. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close a transaction.

*A.     Bid Procedures*

19.     Attached to this Motion are the proposed Bid Procedures.[4]  Pursuant to Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the **"Local Rules"**): (i) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (ii) the Auction will be conducted openly and only the Debtors, the Stalking Horse Purchaser, any representative of any statutory committee appointed in the Cases, the Senior Prepetition Agent and any Qualified Bidder who has timely submitted a Qualified Bid (and professional advisors to each of these parties) may attend the Auction; and (iii) bidding at the Auction will be transcribed or videotaped. The Bid Procedures are typical for asset sales of

---

[4] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Bid Procedures attached hereto as Exhibit B, or the Agreement, as applicable.

this size and nature, include provisions for consultation with the Committee and require a deposit

and that a bidder be a "Qualified Bidder" as defined in the Bid Procedures.

20.     The following paragraphs in this section summarize key provisions of the Bid

Procedures, but are qualified in their entirety by reference to the actual Bid Procedures.

     a.    <u>Participation Requirements</u>.

        i.    <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a **"Confidentiality Agreement"**); and

        ii.    <u>Proof of Financial Ability to Perform</u>. The most current audited and latest unaudited financial statements (collectively, the **"Financials"**) of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion.

     b.    <u>Qualified Bid</u>.

        i.    <u>Modified Agreement</u>. The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Agreement. A Bid must include fully executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated Transaction. A Bid shall include a black-lined copy of the Agreement (the **"Modified Agreement"**) to show all changes requested by the Bidder, including those related to the Purchase Price.

        ii.    <u>Acquired Assets</u>. Each Bid shall be for all of the Acquired Assets.

        iii.    <u>Contingencies</u>. A Bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

        iv.    <u>Authorization to Bid</u>. A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

v.    <u>Good Faith Deposit</u>. Each Bid or Combination Bid must be accompanied by a cash deposit in an amount equal to five percent (5%) of the proposed purchase price offered by the Qualified Bidder in its Qualified Bid (the **"Good Faith Deposit"**).

vi.    <u>No Fees payable to Qualified Bidder</u>. A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bidding Procedures.

vii.    <u>Financing Sources</u>. A Bid must contain evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for all such financing sources.

viii.    <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid or Combination Bid shall have an initial minimum bid requirement equal to the sum of (i) the Purchase Price, (ii) the Expense Reimbursement and (iii) $200,000.00 (the **"Minimum Initial Bid"**).

ix.    <u>Other Evidence</u>. Each Bid must contain evidence satisfactory to the Debtors that the bidder is reasonably likely (based on availability of financing, experience and other considerations) to be able to timely consummate a purchase of the Acquired Assets if selected as the Successful Bidder (as defined below).

x.    <u>Credit Bid</u>. The Senior Prepetition Agent is a Qualified Bidder and shall be entitled to credit bid all or a portion of its claims against the Debtors to the fullest extent permissible under section 363(k) of the Bankruptcy Code. Notwithstanding any provisions to the contrary herein, the Senior Prepetition Agent shall not be required to submit a Bid or Qualified Bid for purposes of exercising its right to credit bid under section 363(k) of the Bankruptcy Code.

c.    <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be [TBD], at 12:00 p.m. (Eastern Time) (the **"Bid Deadline"**). A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).

d.    <u>Auction</u>. In the event that the Debtors receive at least one (1) Qualified Bid (other than the Stalking Horse Purchaser) by the Bid Deadline, the Debtors shall conduct an auction (the **"Auction"**) of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than [TBD], at 4:00 p.m. (prevailing Eastern

time), the Debtors will notify all Qualified Bidders of (i) the highest or otherwise best Qualified Bid, (the **"Baseline Bid"**) and (ii) the time and place of the Auction. The Auction shall commence at [TBD], at the offices of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166.

e. <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before [TBD] 2009.

21. The Debtors, with the consent of the Prepetition Agent expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the consent of the Senior Prepetition Agent, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein, (d) cancel the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

A. *Expense Reimbursement*

22. By this Motion, the Debtors seek authority to be able to award and, if required pursuant to the terms of the Agreement, to reimburse the Stalking Horse Purchaser for reasonable and necessary expenses incurred in connection with the formation, negotiation and documentation of the Agreement (including counsel and financial advisory fees related thereto), and in participation in the Sale process, up to a maximum amount of $300,000.00 (the **"Expense Reimbursement"**). If approved, the Expense Reimbursement will be paid to the Stalking Horse Purchaser pursuant to the terms of the Agreement. Notwithstanding anything to the contrary herein, in the event the Senior Prepetition Agent's bid is selected as the Successful Bid, no Expense Reimbursement shall be payable to the Stalking Horse Purchaser.

*NY 239,657,605v8*

23.     The Debtors seek to provide the Expense Reimbursement in recognition of the Stalking Horse Purchaser's substantial expenditure of time, energy, and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid. The Expense Reimbursement is required by the Agreement. There is no break-up fee being sought herein.

24.     The Agreement and the Stalking Horse Purchaser's monetary offer will form the basis upon which other bids will be submitted and evaluated. The establishment of the Expense Reimbursement permits the Debtors to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates. Thus, even if the Stalking Horse Purchaser is offered the Expense Reimbursement and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Acquired Assets will be sold will reflect their true worth.

B.      *Notice of Auction*

25.     The Debtors seek to have the Auction scheduled for a date no later than September 18, 2009 as mandated by the Agreement and the DIP Facility.  The value of the Acquired Assets will decline substantially if the Sale process is not completed on an expedited basis, as key customers and vendors will terminate their relationships with the Debtors. OEM customers may be extremely reluctant to provide the Debtors with new business while they are in bankruptcy.  Moreover, a stable and quick bankruptcy process will limit the possibility of OEM customers transferring or resourcing existing business.  In addition, the Debtors do not have the funds to operate the business beyond the timeline set forth in the Agreement.  As such, it is imperative to move forward with a sale.

14

26.     Not later than three business days after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as Exhibit E (the **"Sale Notice"**), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Senior Prepetition Agent, (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (f) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (g) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; and (h) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

27.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served so as to be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Senior Prepetition Agent; (iv) counsel to Northstar; (v) the Office of the United States Trustee; (vi) counsel to the Stalking Horse Purchaser; and (vii) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1(b).

28.     Not later than three (3) business days after entry of the Bid Procedures Order, the Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal* or *The New York Times*.

C.     *Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Assumed and Assigned Agreements*

29.     To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements to the Stalking Horse Purchaser, or as applicable, to the Successful Bidder.

30.     Given the large number of executory contracts and unexpired leases to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the **"Cure Amounts"**), and (b) the deadline for objections to the assumption and/or assignment of contracts and leases to be assumed and/or assigned in connection with the Sale (collectively, the **"Cure Procedures"**).

31.     The Debtors shall prepare and distribute to non-Debtor parties to the Assumed Agreements a notice, substantially in the form annexed hereto as **Exhibit F** (a **"Cure Notice"**), listing (i) the Assumed Agreement(s), and (ii) the Cure Amount(s), if any. If the Stalking Horse Purchaser is not the Successful Bidder at the Auction, no later than two (2) business days after the Auction, the Debtors shall send a subsequent Cure Notice, to all non-Debtor parties to executory contracts or unexpired leases to be assigned to the Successful Bidder that were not Assumed Agreements.

32.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed Agreements, the Debtors propose the following deadlines and procedures:

a.      The non-Debtor parties to the Assumed and Assigned Agreements shall have until [TBD] (the **"Contract Objection Deadline"**), which deadline may be extended in the sole discretion of the Debtors, to object (a **"Contract Objection"**) to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assumed Agreements in connection with the Sale; provided, however, if the Stalking Horse Purchaser is not the Successful Bidder at the Auction, and the Debtors send a Cure Notice to a non-Debtor party to an Assumed and Assigned Agreement, or if the Debtors otherwise amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have

16

until the commencement of the Sale Hearing to submit a Contract Objection (the **"Amended Contract Objection Deadline"**).

b.    Any party objecting to the Cure Amounts or objecting to the potential assumption and/or assignment of such Assumed Agreement(s), shall be required to file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed Agreements(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m. on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to an Assumed Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the **"Disputed Cure Amount"**), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse Purchaser, or the Successful Bidder, as applicable, of such consensual resolution, the Debtors shall promptly provide the Stalking Horse Purchaser (or the Successful Bidder) notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter.

33.    Unless an objection to the assumption and assignment of an Assumed Agreement is filed and served before the Contract Objection Deadline, or the Amended Contract Objection Deadline, as applicable, all counterparties to the Assumed Agreements shall (i) be forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed Agreements, and the Debtors and Stalking Horse Purchaser or the Successful Bidder, as applicable shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) be deemed to have consented to the assumption and assignment, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or Stalking Horse Purchaser or the Successful Bidder, as applicable, that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Agreements or that there is any objection or defense to the assumption and assignment of such Assumed Agreements.

17

## BASIS FOR RELIEF REQUESTED

A.   *The Sale is Within the Sound Business Judgment of the Debtors and Should Be Approved*

34.   Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991).

35.   The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but,

18

rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

36.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

37.     The Debtors submit that sound business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures.  Absent a sale of their assets, the

Debtors' lack sufficient cash resources to continue to operate the business and pay their debts as they are due, the Acquired Assets will continue to decline in value absent a prompt sale. Moreover, the entire auto industry is in a crisis, prices of all assets are dropping, and there is virtually no available financing for prospective buyers of auto assets. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

38.     The Notice of Auction and the Sale is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets. Indeed, the Debtors have and will continue to market the Acquired Assets, and will solicit the most likely interested competing bidders. The Debtors also intend to retain an investment banker to assist in the marketing of the Acquired Assets, solicit interested competing bidders, disseminate due diligence information and assist in the auction process. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

39.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets. The process proposed by the Debtors allows for a timely and efficient auction process, given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and to perform diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be

20

fair and reasonable, and, therefore, the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

B.      *The Sale is Proposed in "Good Faith" 363(m) of the Bankruptcy Code*

40.      The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

41.      Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

42.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

43.      The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Stalking Horse Purchaser, although an affiliate of an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, acted in good faith. For example, the Debtors had separate legal counsel negotiate the sale transaction, several drafts of the Agreement and the Bid Procedures were exchanged and the parties engaged in negotiations and compromise of several issues. Accordingly, the Debtors request that the Court make the finding that the Stalking Horse

Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

C.     *The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code*

44.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

45.     The Senior Prepetition Lenders consent to the form of the Bid Procedures and the Agreement in substantially the forms attached hereto, and the release of their liens in the Acquired Assets, <u>provided that</u>, (i) the Bid Procedures and the Agreement shall not be modified at any time without the Senior Prepetition Agent's prior written consent, and (ii) (a) any sale of the Acquired Assets to the Stalking Horse Purchaser provides for the assumption of the Senior Prepetition Loans and the DIP Facility or (b) any sale of the Acquired Assets to another party provides for the immediate payment of all amounts due the Senior Prepetition Lenders under the Senior Prepetition Loans and the DIP Facility.  Subject to the foregoing sentence, to the extent the Senior Prepetition Lenders consent to the release of their liens in the Acquired Assets, pursuant to the Intercreditor Agreement, Northstar is prohibited from challenging, contesting or

opposing the sale and disposition of the Acquired Assets under Section 363 of the Bankruptcy Code. See Intercreditor Agreement Section 2.4(b)(i).

46.     The Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

D.     *The Expense Reimbursement is Reasonable and Appropriate*

47.     Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999) ("In re O'Brien"). In *In re O'Brien,* the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re 0 'Brien,* 181 F.3d at 535. Here, the Expense Reimbursement should be approved because it will provide a benefit to the Debtors' estates.

48.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, an expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a

bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second:

> if the availability of break-up fees...expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

*Id.*

49.    After considering the reasonableness of bidding incentives, courts have approved the reimbursement of a stalking horse and out-of-pocket expenses. *In re Radnor Holdings,* Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *In re Great Northern Paper, Inc.,* Case No. 03-10048 (Bankr. D. Me. February 18, 2003).

50.    The Expense Reimbursement also induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely.  The Debtors' ability to continue to shop the Acquired Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser—a "bird-in-the-hand"—would be eliminated if the Debtors are not authorized to remit the Expense Reimbursement. Therefore, absent authorization of the payment of the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Agreement.

51.    The Stalking Horse Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that Debtors will receive the best possible price for the Acquired Assets.  Moreover, the Debtors' customers will take comfort that the Stalking Horse Bid will ensure the continuation of the Debtors' business and not seek alternative manufacturers.  Accordingly, the Bid Procedures, including the Expense Reimbursement, are

reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

52.    Not only is the Expense Reimbursement necessary, it is reasonable. Paying an Expense Reimbursement of less than one percent of the total value of the consideration being given is reasonable since the Stalking Horse's bid of approximately $81 million includes the assumption of the DIP Facility, the Senior Prepetition Loan and the Assumed Liabilities, including the Cure Amounts. In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Expense Reimbursement.

53.    The Debtors' payment of the Expense Reimbursement under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Purchaser.

54.    The Debtors have demonstrated a sound business justification for authorizing the Expense Reimbursement and its clear necessity and benefit to these estates. Thus, the Debtors request that this Court approve and authorize payment of the Expense Reimbursement.

E.    *The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved*

55.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

25

whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

56.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

57.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of

future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the

27

benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

59. The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these cases.

F.      *Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) is Appropriate*

60. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) is waived.

61. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the

28

objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

62.     As described above, time is clearly of the essence, since the Debtors are on the verge of losing key customers and vendors, have insufficient cash to operate the business on a prolonged basis, and the "perfect storm" of financial and automotive crisis and the uncertainty of the viability of the "Big 3" automakers, is resulting in a decline on the value of the assets. Since the closing of the Sale promptly is of critical importance, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h).

## NOTICE

63.     Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) the parties included on the Debtors' list of thirty (30) creditors holding the largest unsecured claims on a consolidated basis; (iii) counsel for the Debtors' prepetition and post-petition lenders; and (iv) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*NY 239,657,605v8*

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as <u>Exhibit C</u>; and (iv) such other and further relief as the Court deems just and proper.

Dated: _July 27_, 2009

GREENBERG TRAURIG, LLP

Scott D. Cousins (DE Bar No. 3079)
Sandra G. M. Selzer (DE Bar No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
Email:  cousinss@gtlaw.com
      selzers@gtlaw.com
-and-

Nancy A. Mitchell
Alan J. Brody
200 Park Avenue
New York, New York  10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
Email:  mitchelln@gtlaw.com
      brodya@gtlaw.com
Proposed Counsel for the Debtors
  and Debtors-in-Possession

NY 239,657,605v8