# EXHIBIT D

ASSET PURCHASE AGREEMENT

By and Between

**STANT PARENT CORP., STANT HOLDING CORP., STANT CORPORATION, STANT MANUFACTURING, INC., STANDARD-THOMSON CORPORATION AND THOMSON INTERNATIONAL CORPORATION**

AS SELLER

And

**VAPOR ACQUISITION CORP.**

AS BUYER

Dated as of July __, 2009

# TABLE OF CONTENTS

Page

ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS ...................................... 1

1.1     Purchase, Sale and Transfer of Acquired Assets. ...................................................... 1
1.2     Excluded Assets. ........................................................................................................ 5
1.3     Assumption of Liabilities. .......................................................................................... 6
1.4     Excluded Liabilities. .................................................................................................. 7
1.5     Designation Right Contracts. ..................................................................................... 9

ARTICLE 2 CONSIDERATION ............................................................................................. 10

2.1     Consideration. ........................................................................................................... 10

ARTICLE 3 CLOSING AND DELIVERIES ........................................................................... 10

3.1     Closing. ..................................................................................................................... 10
3.2     Seller's Deliveries. .................................................................................................... 10
3.3     Buyer's Deliveries. .................................................................................................... 11

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ................................ 11

4.1     Corporate Organization. ........................................................................................... 11
4.2     Authorization and Validity. ...................................................................................... 11
4.3     No Conflict or Violation. .......................................................................................... 11
4.4     Governmental Consents and Approvals. ................................................................... 12
4.5     Title to Assets. .......................................................................................................... 12
4.6     Law and Legal Proceedings: ..................................................................................... 12
4.7     Environmental Matters. ............................................................................................. 12
4.8     Labor Relations. ........................................................................................................ 13
4.9     Validity of Contracts. ............................................................................................... 13
4.10    Intellectual Property. ................................................................................................ 14
4.11    Insurance. ................................................................................................................. 14
4.12    Access to Due Diligence. ......................................................................................... 14
4.13    Good Faith Buyer. .................................................................................................... 14
4.14    No Material Misstatements or Omissions. ............................................................... 14
4.15    No Brokers or Finders. ............................................................................................. 14
4.16    Litigation; Proceedings. ........................................................................................... 15
4.17    Board Approval and Recommendations. .................................................................. 15
4.18    Compliance with Laws. ............................................................................................ 15

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 15

5.1     Limited Liability Company Organization. ................................................................ 15
5.2     Authorization and Validity. ...................................................................................... 15
5.3     No Conflict or Violation. .......................................................................................... 16

|       | 5.4   | Consents, Approvals and Notifications............................................................16 |
|       | 5.5   | Availability of Funds. ....................................................................................16 |

## ARTICLE 6 COVENANTS OF SELLER..............................................................................16

|       | 6.1   | Actions Before Closing....................................................................................16 |
|       | 6.2   | Conduct of Business Prior to Closing............................................................16 |
|       | 6.3   | Consents and Approvals. ................................................................................18 |
|       | 6.4   | Access to Properties and Records; Confidentiality........................................19 |
|       | 6.5   | Further Assurances...........................................................................................19 |
|       | 6.6   | Payments and Revenues...................................................................................19 |
|       | 6.7   | Preservation of Business Records...................................................................19 |
|       | 6.8   | Casualty............................................................................................................19 |
|       | 6.9   | Name Change....................................................................................................19 |

## ARTICLE 7 COVENANTS OF BUYER...............................................................................20

|       | 7.1   | Actions Before Closing Date. .........................................................................20 |
|       | 7.2   | Consents, Approvals and Notifications............................................................20 |
|       | 7.3   | Availability of Business Records and Transferred Employees........................20 |
|       | 7.4   | Notices. ............................................................................................................20 |
|       | 7.5   | Payments and Revenues...................................................................................21 |

## ARTICLE 8 EMPLOYEES AND EMPLOYEE BENEFITS; RELEASES...................................21

|       | 8.1   | Employment.....................................................................................................21 |
|       | 8.2   | Release.  ..........................................................................................................22 |

## ARTICLE 9 BANKRUPTCY COURT APPROVAL................................................................23

|       | 9.1   | Expense Reimbursement..................................................................................23 |
|       | 9.2   | Bankruptcy Court Approval.............................................................................23 |
|       | 9.3   | Certain Bankruptcy Undertakings by Seller. ..................................................23 |

## ARTICLE 10 TAXES.........................................................................................................24

|       | 10.1  | Taxes Related to Purchase of Assets. .............................................................24 |
|       | 10.2  | Proration of Real and Personal Property Taxes. .............................................24 |
|       | 10.3  | Cooperation on Tax Matters. ...........................................................................25 |
|       | 10.4  | Retention of Tax Records.  ..............................................................................25 |
|       | 10.5  | Unbilled Transactional Taxes. ........................................................................25 |

## ARTICLE 11 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ...................25

|       | 11.1  | Conditions Precedent to Performance by Seller. ............................................25 |
|       | 11.2  | Conditions Precedent to the Performance by Buyer. ......................................26 |
|       | 11.3  | No Material Adverse Effect.............................................................................28 |
|       | 11.4  | Employment Agreements.................................................................................28 |

ARTICLE 12 TERMINATION AND EFFECT OF TERMINATION ..........................................28

    12.1    Right of Termination...............................................................................28
    12.2    Termination Without Default....................................................................28
    12.3    Expense Reimbursement..........................................................................30
    12.4    Effect of Failure of Buyer's Conditions to Closing. ...................................31

ARTICLE 13 MISCELLANEOUS ..........................................................................................31

    13.1    Successors and Assigns............................................................................31
    13.2    Governing Law; Jurisdiction.....................................................................31
    13.3    Warranties Exclusive. ..............................................................................31
    13.4    Mutual Drafting......................................................................................32
    13.5    Expenses. ...............................................................................................32
    13.6    Broker's and Finder's Fees. .....................................................................32
    13.7    Severability. ...........................................................................................32
    13.8    Notices. ..................................................................................................32
    13.9    Amendments; Waivers..............................................................................33
    13.10   Public Announcements. ............................................................................33
    13.11   Entire Agreement. ...................................................................................34
    13.12   Parties in Interest....................................................................................34
    13.13   DAMAGES. ............................................................................................34
    13.14   Headings. ...............................................................................................34
    13.15   Construction............................................................................................34
    13.16   Currency. ................................................................................................34
    13.17   Time of Essence......................................................................................34
    13.18   Counterparts. ..........................................................................................34

ARTICLE 14 DEFINITIONS ..................................................................................................35

    14.1    Certain Terms Defined.............................................................................35

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of July 27, 2009, is made by and between Stant Parent Corp., Stant Holding Corp., Stant Corporation, Stant Manufacturing, Inc., Standard-Thomson Corporation and Thomson International Corporation (collectively, the "*Seller*") and Vapor Acquisition Corp., a Delaware Corporation or its designee (the "*Buyer*"). Capitalized terms used in this Agreement are defined in Article 14.

## PREAMBLE

WHEREAS, Seller is a leading, integrated manufacturer of highly engineered fluid systems for the global automotive and industrial original equipment markets and automotive aftermarket that maintains its global operational and manufacturing headquarters in Connersville, Indiana, a manufacturing facility in Pine Bluff, Arkansas and a sales office in Troy, Michigan (the "**Business**");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Acquired Assets, as defined below;

WHEREAS, it is intended that the acquisition of the Acquired Assets would be accomplished through the sale, transfer and assignment of the Acquired Assets by Seller to Buyer; and

WHEREAS, Buyer also desires to assume, and Seller desires to assign and transfer to Buyer, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1     <u>Purchase, Sale and Transfer of Acquired Assets</u>.  At the Closing, and upon the terms and conditions herein set forth, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in, to and under (in each case free and clear of any and all Liens, Claims or Encumbrances, other than Permitted Liens) whether arising prior to or subsequent to the date of the filing of the Chapter 11 petitions of Seller, the Acquired Assets.  "*Acquired Assets*" shall mean all direct or indirect, right, title and interests of the Seller in and to all the tangible and intangible assets, properties, rents, claims and contracts of the Seller, to the extent transferable, including without limitation the following property, but shall exclude the Excluded Assets:

> (a)     all of Seller's rights and interests under the leases of real property (the "*Real Estate Leases*") identified by Buyer in writing no less than two (2) business days prior to the Auction, including rights to

security deposits related thereto (the real property leased by Seller pursuant to the Real Estate Leases, the "***Leased Real Property***");

(b)     all of Seller's rights and interests in and to real property (other than Leased Real Property), except any real property identified by Buyer in writing no less than two (2) business days prior to the Auction (the "***Owned Real Property***");

(c)     all of Seller's rights and interests under the easements, rights of way, real property licenses, and other real property entitlements related to the Real Estate Leases or the Owned Real Property, including security deposits held pursuant thereto (the "***Entitled Real Property***" and, together with the Leased Real Property and Owned Real Property, the "***Assigned Real Property***");

(d)     all of (i) Seller's rights and interests to the buildings, improvements and FF&E now or hereafter located on the Assigned Real Property, subject to limitations set forth in the Real Estate Leases (collectively, the "***Improvements***"); (ii) Seller's owned equipment, security devices, furniture, fixtures, tools and other personal property including, without limitation, all machinery and equipment located at the Assigned Real Property, but excluding any of the foregoing items under capitalized leases and similar instruments not constituting Assigned Contracts (collectively, the "***Equipment***"); and (iii) any rights of Seller to the warranties and licenses received from manufacturers and Seller of the Equipment, Improvements or any component thereof;

(e)     all of Seller's rights and interests under (i) all sales orders, customer contracts or other similar Contracts entered into by Seller with its customers ("***Customer Contracts***"), (ii) outstanding purchase orders or other Contracts entered into by Seller with any supplier ("***Supplier Contracts***") or (iii) all other Contracts, including, but not limited to executory and capital equipment, vehicle leases, sales representative agreements, agency agreements, and employment agreements, except, in each case, as identified by Buyer in writing no less than two (2) business days prior to the Auction (the "***Other Contracts***" and, together with the Real Estate Leases, the Customer Contracts and the Supplier Contracts, the "***Assigned Contracts***");

(f)     all of Seller's rights and interests (i) to the inventory owned by Seller on the Closing Date, including, but not limited to inventory located in outside warehouses and consignment inventory located at customer sites (the "***Inventory***"), and (ii) to the warranties received from suppliers with respect to such Inventory;

(g)     all of Seller's Intellectual Property Rights owned, licensed or used by Seller, including, but not limited to dies, tooling and

engineering and design specifications, to the extent transferable, along with all income, royalties, damages and payments due or payable to Seller as of the Closing, or thereafter, including, without limitation, damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property in Sellers' possession or control (the "*Acquired Intellectual Property*");

(h)     any computer software or systems owned by Seller and licenses held by Seller, other than items of the foregoing description constituting Excluded Assets;

(i)     all rights and interests of Seller under any Permits;

(j)     all of Seller's accounts or notes receivable (whether current or noncurrent), rebates, refunds, and all causes of action specifically pertaining to the collection of the foregoing, and another receivables on the Closing Date (the "*Accounts Receivable*");

(k)     copies of all Business Records, in any media;

(l)     all cash and cash equivalents held by or on behalf of the Seller;

(m)     all security and utility deposits, credits, allowance, prepaid assets or charges, rebates and setoffs related to the Acquired Assets (except for utility deposits paid after the commencement of the Bankruptcy Cases, and for security deposits relating to Seller's (i) Real Estate Leases which are not Assigned Contracts, or (ii) Contracts that are not Assigned Contracts);

(n)     all of Seller's rights and interests to insurance proceeds or other insurance recoveries to the extent such rights relate to Acquired Assets or Assumed Liabilities, except as related to Director and Officers liability insurance policies;

(o)     all websites, software, copyrightable materials, intellectual property and general intangibles, including, without limitation, rights to and goodwill represented by the name "Stant or "Standard Thomson", and any other trade names used by the Seller in the operation of the Business;

(p)     all of Seller's customer lists;

(q)     all stock, equity and ownership interest in any subsidiaries of the Seller, which are not otherwise a Seller;

(r)     all warranty claims relating to or arising from the period prior to the Closing Date;

(s)     all of Seller's bank accounts, investment accounts, safety deposit boxes, lock boxes and the like as of the Closing Date and the contents thereof;

(t)     all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties, including, without limitation, non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(u)     all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(v)     all rights, claims or causes of action of Seller, including, Avoidance Actions, relating to or arising out of the operation of the Business or the Acquired Assets, including (i) any actions against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business, including Transferred Employees, and/or any of the Seller's lenders, landlords or vendors and/or (ii) relating to the ongoing or future operations of the Business;

(w)     all tax attributes of Seller relating to the Acquired Assets, including all incentives, losses, loss carry forwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Seller relating to any period, or portion of any period, on or prior to the Closing Date, including, without limitation, interest receivable with respect thereto and any future tax incentives;

(x)     all indemnities, including, without limitation, any indemnification Claims or other settlement proceeds due from Tomkins Corporation;

(y)     all promotional allowances and vendor rebates and similar items;

(z)     all Tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the Closing Date;

(aa)     all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever

located, including, without limitation, all property of any kind located in any building, office or other space leased, owned or occupied by Seller or in any warehouse where any of Sellers' properties and assets may be situated

(bb)    all claims, deposits, prepayments, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent)

(cc)    the right to receive and retain mail, accounts receivable payments and other communications;

(dd)    all goodwill as a going concern and all other intangible properties;

(ee)    all telephone numbers;

(ff)    all rights to proceeds under insurance policies;

(gg)    all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists; and

(hh)    all properties, assets, rights, titles and interests of every kind and nature, owned or leased by Sellers (including indirect and other forms of beneficial ownership) owned by Seller related to or useful in connection with the operation of the Business and/or Seller's performance of its obligations under the Assigned Contracts in the ordinary course.

1.2    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, the Acquired Assets are the only properties and assets transferred to, or otherwise acquired by, Buyer under this Agreement. Without limiting the generality of the foregoing, the Acquired Assets do not include (i) any right, title or interest of any Person other than Seller in any property or asset, and (ii) the properties and assets of Seller listed or described in this Section 1.2 (all properties and assets not being acquired by Buyer are herein collectively referred to as the "*Excluded Assets*"):

(a)    causes of action of Seller, including, without limitation, Avoidance Actions that are unrelated to the Business and are not Acquired Assets;

(b)    all of Seller's Collective Bargaining Agreements;

(c)    all of Seller's Real Estate Leases that are not Assigned Real Property;

(d)     all of Seller's rights under Contracts that are not Assigned Contracts;

(e)     all rights to claims, refunds or adjustments with respect to Excluded Assets or Excluded Liabilities relating to any proceeding before any Government relating to the period prior to the Closing Date;

(f)     all rights of Seller arising under this Agreement and under any other agreement between Seller and Buyer entered into in connection with this Agreement;

(g)     all rights of Seller under its Director and Officers liability insurance policies;

(h)     all of Seller's rights to security deposits relating to any Real Estate Lease which are not an Assigned Contract; and

(i)     only to the extent subject to capitalized leases and similar instruments not constituting Assigned Contracts, Seller's owned equipment, security devices, furniture, fixtures, tools and other personal property used in connection with the Business.

1.3     <u>Assumption of Liabilities</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to Buyer, Buyer will assume and pay, perform and discharge when due and otherwise in accordance with the terms of this Agreement, only the following liabilities (collectively, the "***Assumed Liabilities***"):

(a)     the Restructured Senior Indebtedness;

(b)     all liabilities and obligations of Seller under the Assigned Contracts and under the Assigned Real Property first arising from the period commencing after the Closing Date;

(c)     all Cure Amounts;

(d)     all liabilities and obligations relating to or arising from the Acquired Assets or the operation of the Business relating to or arising from the period commencing on or after the Closing Date;

(e)     all properly perfected PMSI Claims (which shall include lease agreements for equipment and contain a nominal or $1.00 purchase option), <u>provided</u>, <u>however</u>, that (i) the equipment is an Acquired Asset and (ii) each holder of a PMSI Claim shall continue to receive the monthly amortized payments set forth in the pre-petition agreement (at the non-default interest rate and without the allowance of any late payments or penalties) with any pre-petition arrangements to be added at the end of the

contract and paid in one-lump payment on the therewith day following the natural un-accelerated due date under the applicable contract;

> (f)     all liabilities and obligations for any Taxes relating to or arising from the Acquired Assets or the Business relating to or arising from the period commencing on the Closing Date;

> (g)     Administrative Claims of the Seller related to ordinary course operating expenses to be paid in the ordinary course after the Closing Date to the extent consistent with the ordinary course operating history of the Seller and pursuant to a budget agreed to by the Buyer; and

> (h)     unused vacation or sick leave earned and accrued (to the extent not paid) with respect to the Transferred Employees as of the Closing Date.

Notwithstanding anything in this Agreement to the contrary, Seller hereby acknowledge and agrees that Buyer is not assuming from Seller, or is in any way responsible for, the Excluded Liabilities.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or any Seller as compared to the rights and remedies which such third party would have had against any Seller absent the Chapter 11 Cases had Buyer not assumed such Assumed Liabilities.

1.4     Excluded Liabilities.  Except for the specific Assumed Liabilities, Buyer shall not assume or be liable for or bound by any Liability of Seller, or any predecessor or Affiliate of any Seller or any Lien, including, without limitation any duties, responsibilities, liabilities, assessments, penalties or obligations of any kind or nature, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent, at law or in equity or otherwise, including any Liability based on successor liability theories (herein referred to as the "***Excluded Liabilities***"), including, without limitation, the following specific Excluded Liabilities:

> (a)     All Liabilities of every kind whether or not asserted, scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Bankruptcy Cases, secured, priority, administrative or unsecured, in each case, accrued prior to on or after the Petition Date;

> (b)     All Liabilities of Seller or any predecessor or Affiliate of any Seller under any Contract of Seller that is not an Assigned Contract whether accruing prior to, at or after the Effective Date;

> (c)     Any and all Liabilities for Taxes arising from or with respect to the Acquired Assets or the Business that are included in or attributable to the operation of the Business on or before the Closing Date;

(d)     Any and all Liability under WARN Act (or similar state statute) incurred by Seller or any predecessor or Affiliate of any Seller prior to the Closing Date;

(e)     Any indebtedness or obligation for borrowed money of Seller or any predecessor or Affiliate of any Seller, except to the extent that any such indebtedness or obligation is an Assumed Liability;

(f)     All ordinary course compensation liabilities or other obligations relating to any Employees or former employee of the Seller or any predecessor or Affiliate of any Seller, including: (i) accrued vacation, other paid time off, and accrued gross payroll liabilities and obligation, (including payroll taxes accrued and unpaid), but excluding all liabilities and obligations); (ii) any worker's compensation claims (whether reported or not), (iii) any litigation claims, including without limitation any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state law, and any whistleblower claims; (iv) any claims under any of the Seller's Employee Benefit Plans; or (v) any claims under any Collective Bargaining Agreements;

(g)     Any Liabilities for Taxes arising prior to or on the date of the Closing (including Taxes, if any, resulting from the consummation of the transactions contemplated by this Agreement);

(h)     To the maximum extent permitted by Law, Liabilities arising under any Environmental Law or any other law including as a result of any action or inaction of the Seller or of any third party relating to the storage, use or operation of the Acquired Assets on or before the Closing Date;

(i)     To the maximum extent permitted by Law, any Liability arising out of or relating to any violation of any Law, rule, regulation, judgment, injunction, Order or decree occurring or arising out of or relating to any event or condition occurring or existing at or prior to the Effective Date;

(j)     Any Liability for (i) all costs and expenses incurred by Seller or any predecessor or Affiliate of any Seller or owed in connection with the administration of the Bankruptcy Case (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and

(k)    Any and all Liabilities incurred by Seller or any predecessor or Affiliate of any Seller (whether incurred prior to or after the Petition Date) of whatever kind, other than the Assumed Liabilities.

(l)    Any Liabilities or indemnification obligations or Claims, including without limitation, due to Tomkins Corporation.

(m)    Any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers or any predecessor or Affiliate of any Seller or to any third party, including, without limitation, Tomkins Corporation.

For the avoidance of doubt, Buyer shall not be liable for any Liabilities or obligations that are subject to litigation or arbitration as of the Closing Date, or that arose prior to the Closing Date and are asserted thereafter, including such Liabilities or obligations that otherwise would be Assumed Liabilities. Notwithstanding anything to the contrary in this Agreement, Excluded Liabilities shall not include any Restructured Senior Indebtedness.

1.5    Designation Right Contracts.    Notwithstanding anything herein to the contrary, Buyer reserves the right to amend the list of Assigned Contracts and designate any Contract, whether originally listed on the list of Assigned Contracts or not, (such Contract being referred to as a "**Designation Right Contract**") as an Assigned Contract under at any time during the period commencing from the date hereof and ending on the sixtieth (60th) day following the Closing Date (such period being referred to as the "**Designation Right Period**"). For purposes of the Bidding Procedures Order, those contract counterparties to the Designation Right Contracts shall receive a Notice of Assumption and Assignment (as defined in the Bidding Procedures Order) as if they were contract counterparties to the Assigned Contracts. In the event that any Designation Right Contract is designated to be an Assigned Contract by Buyer within such Designation Right Period, then following the Closing and in accordance with procedures established by the Bankruptcy Court for the allowance of Cure Amounts, Buyer shall pay such Cure Amount (or provide Seller with sufficient cash to pay the Cure Amount), if any, to such contract counterparty of the Designation Right Contract then designated as an Assigned Contract. During the period commencing on the Effective Date and ending on the earlier of (i) the designation of such Designation Right Contract as an Assigned Contract or an Excluded Asset or (ii) the expiration of the Designation Right Period, Buyer shall perform the obligations of Seller accruing after the Effective Date with respect to such remaining Designation Right Contracts, provided, however, in no event shall Buyer be deemed to have assumed any Liabilities of Seller with respect to such remaining Designation Right Contracts. Any Designation Right Contract that is not designated as an Assigned Contract pursuant to this Section 1.5 within such Designation Right Period shall be deemed an Excluded Asset.

## ARTICLE 2
## CONSIDERATION

2.1    Consideration.  The aggregate consideration for the sale and transfer of the Acquired Assets (the "***Purchase Price***"), shall be an estimated $81 million, comprised of: (a) the assumption of all amounts due under the DIP Facility, (b) assumption of the Restructured Senior Indebtedness and (c) the assumption of Assumed Liabilities including Cure Amounts.

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1    Closing.  The consummation of the transactions contemplated hereby (the "***Closing***") shall take place at the offices of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York  10166, at 9:00 a.m. on or before September 18, 2009, following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 11, or on such other date or at such other place and time as may be agreed to by the parties hereto; provided, however, that the date of the Closing shall be automatically extended if any of the conditions set forth in Article 11 shall not be satisfied or waived, subject, however, to the provisions of Article 12 (the date on which the Closing occurs, hereinafter, the "***Closing Date***").

3.2    Seller's Deliveries.  The sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer, as herein provided, shall be effected on the Closing Date.  At the Closing, Seller will deliver or cause to be delivered to Buyer:

> (a)    a bill of sale in customary form as agreed between Buyer and Seller prior to the Closing Date, executed by Seller;

> (b)    an Assignment and Assumption Agreement in customary form as agreed between Buyer and Seller prior to the Closing Date (the "***Assignment and Assumption Agreement***"), executed by Seller, which shall provide for, among other things, the assumption and assignment to Buyer of all the Seller's rights, title and interests in and to the Acquired Assets and all of the Seller's obligations with respect to the Assumed Liabilities;

> (c)    the duly executed and acknowledged Assigned Real Property Conveyance Documents;

> (d)    copies of the Business Records (it being understood that any Business Records left at the Assigned Real Property need not be physically delivered, but shall be deemed delivered at the Closing), provided, however, that any original Business Records reasonably required by the Seller shall be delivered to the Seller at the Closing upon such request; and

> (e)    Possession of the Acquired Assets.

3.3     Buyer's Deliveries.  At the Closing Date, in payment for the Acquired Assets, Buyer shall pay, deliver or cause to be delivered:

(a)     to the Seller, the cash portion of the Purchase Price, if any, by wire transfer of immediately available funds to a bank account designated by Seller in writing to Buyer on the Closing Date; and

(b)     to the Seller, the Assignment and Assumption Agreement executed by Buyer.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as of the date hereof as follows:

4.1     Corporate Organization.  Each Seller is duly organized and validly existing and in good standing under the Laws of the State of their incorporation.  Seller has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now conducted (including the Business), and to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be party.  Seller is in good standing under the laws of each jurisdiction in which it owns or leases its real property and each other jurisdiction in which the conduct of its businesses or the ownership of its properties requires such qualification or authorization, except where failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect or where the violation is the Seller's bankruptcy filing.

4.2     Authorization and Validity.  Subject to Bankruptcy Court approval, Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreement to which it is or will be a party and, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements and the performance by Seller of its obligations hereunder and thereunder have been duly authorized by all necessary action on behalf of Seller, and no other proceedings on the part of Seller are necessary to authorize such execution, delivery and performance.   This Agreement has been, and the Ancillary Agreements when delivered will be, duly executed by Seller, and, subject to Bankruptcy Court approval, constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

4.3     No Conflict or Violation.  None of the execution and delivery by Seller of this Agreement and the Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller to make any payment under, or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under any provision of (i) the certificate of incorporation and bylaws (collectively, the "***Organizational Documents***") of the Seller; (ii) any Assigned Contract, except as set forth in any such Assigned Contract, and subject to the effect of applicable bankruptcy law and the Sale Order; or (iii) any Order of any court, Government or arbitrator applicable to Seller

or the properties or assets of the Seller; other than, in the case of clauses (ii) and (iii), such conflicts, violations, defaults, terminations, cancellations or accelerations that would not have a Material Adverse Effect.

4.4     Governmental Consents and Approvals.  Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby do not require the consent or approval of, or filing with, any Government (excluding business licenses required in connection with the conduct of the Business), and no consent or waiver of any party to any Assigned Contract is required, except as set forth in any such Assigned Contract, and for such consents, approvals and filings, the failure to obtain or make which would not, individually or in the aggregate, have a Material Adverse Effect.

4.5     Title to Assets.  Seller has good valid, marketable and undivided title to or interest in (as applicable) all of the Acquired Assets.  The Acquired Assets constitute all the properties and assets relating to, used or held for use in connection with the Business, other than the Excluded Assets.  There are no material assets or properties used primarily in the operation of the Business and owned by a third party that constitute Acquired Assets.

4.6     Law and Legal Proceedings:

        (a)     There are no Legal Proceedings pending or, to Seller's knowledge, threatened against Seller before any Government authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the business of the Seller or the Acquired Assets.

        (b)     There is no action, suit, proceeding or claim relating to the ownership, occupancy, operation, use or maintenance of the Acquired Assets which is pending before any Government authority nor, to Seller's knowledge, is any such action, suit, proceeding or claim threatened, except such actions, suits, proceedings or claims that, if decided against the Seller, would not be a Material Adverse Effect.

        (c)     Seller has not received any notice of violation of the Code or any ordinance, regulation, law, or statute any Government agency pertaining to the Acquired Assets or the Seller's Business or any portion thereof or any zoning ordinances, building codes or parking requirements that would constitute a Material Adverse Effect.

4.7     Environmental Matters.

        (a)     Except as would not reasonably be expected to have a Material Adverse Effect, Seller is in compliance with all applicable Environmental Laws. Seller has not received written or oral notice of any pending or, threatened claim or investigation by any Government authority or any other Person concerning material potential liability of any Seller

under Environmental Laws in connection with the ownership or operation of the Acquired Assets. Except as has been expressly disclosed to Buyer in writing prior to the date of entry of the Sale Order, to the Seller's knowledge there has not been a release of any Hazardous Substance at, upon, in, from or under the Acquired Assets in quantities or under circumstances that would give rise to any liability or require remediation, investigation or clean up pursuant to any Environmental Law.

(b)     Seller has provided or made available to Buyer written non-privileged reports, if any, in the possession or control of Seller relating to the presence or migration of Hazardous Substances on, in or under the Acquired Assets.

(c)     No material capital or other expenditures are required to reach or maintain compliance with current Environmental Laws with respect to the operations at the Acquired Assets

4.8     <u>Labor Relations</u>.     Within the preceding five (5) years, Seller has implemented "plant closing" or "mass layoff" of employees that would reasonably be expected to require notification under the WARN Act or any similar state or local law, and has provided all proper notice required thereunder.

4.9     <u>Validity of Contracts</u>.

(a)     To Seller's Knowledge, there are no facts or circumstances that would render any Contract, other than any Contract that is not an Assigned Contract (each an, "**<u>Excluded Contract</u>**") invalid or unenforceable under applicable law, which, if true, would adversely affect the Business. There are no Actions by or before any court or Government Authority pending or, to the Knowledge of Seller, threatened in writing by or against Seller that questions or challenge the validity of any Contract (excluding any Excluded Contracts) which if true would adversely affect the Business. Each Contract (other than any Excluded Contract) is enforceable in accordance with its terms, subject to applicable receivership, conservatorship and supervisory powers of bank regulatory agencies as well as bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     Subject to the Bankruptcy Code, Seller has duly performed all its material obligations under each Contract (other than any Excluded Contract) to the extent that such obligations to perform have accrued, and no material breach or default, or, to Seller's knowledge, alleged material breach or default or event that would (with the passage of time, notice or

both) constitute a material breach or default by Seller thereunder has occurred.

(c)     No material breach, default or loss, or, to the Knowledge of Seller, alleged material breach, default, loss, or event that would (with the passage of time, notice or both) constitute a material breach, default or loss by any third party has occurred with respect to the Contracts (other than the Excluded Contracts) which would adversely affect the Business.

4.10    Intellectual Property.  Seller is the sole owner of the entire right, title and interest in, or possesses valid licenses or other rights to Seller Intellectual Property Rights and/or Intellectual Property Licenses (collectively, the *"Seller Intellectual Property"*.  There: (i) are no infringements or misappropriations by and third party of any of Seller Intellectual Property, (ii) there is no pending, or threatened, Action to which Seller is a party claiming that Seller has infringed any Intellectual Property Rights of a third party and that would adversely affect the Business, (iii) the execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the consummation of the transactions contemplated in this Agreement will not breach, violate or conflict with any instrument or agreement concerning Seller Intellectual Property, and (iv) none of Seller Intellectual Property infringes on the Intellectual Property Rights of any third party.  There are no consents required in connection with the assignment and transfer of Seller Intellectual Property to Buyer in connection with the consummation of the transactions contemplated under this Agreement.

4.11    Insurance.  All of Seller's insurance policies are in full force and effect.  Seller has paid all premiums on such policies due and payable prior to the date of this Agreement.  To Seller's Knowledge, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.  Seller has no pending claims for benefits under such policies not previously disclosed to Buyer in writing.

4.12    Access to Due Diligence.  Seller has provided Buyer with full access to its premises, personnel and documents for the conduct of Buyer's due diligence investigation.

4.13    Good Faith Buyer.  This Agreement was negotiated and entered into at arm's length and, to Knowledge of Seller, in good faith, and to the Knowledge of Seller, there are no facts to support a finding that Buyer negotiated and entered into this Agreement other than in good faith as described in Section 363(m) of the Bankruptcy Code.

4.14    No Material Misstatements or Omissions.  To Seller's Knowledge, none of the representations made by Seller in this Agreement, nor any certificate or document furnished by Seller pursuant to this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading.

4.15    No Brokers or Finders.   No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of the Seller in connection with the negotiation, execution or performance of this Agreement or the

transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.16 <u>Litigation; Proceedings</u>. There is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to the Knowledge of the Seller, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to the knowledge of the Seller, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.17 <u>Board Approval and Recommendations</u>. The Board of Directors (or similar governing Body) of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of and ability to accept Alternative Transactions, a sale, assignment and assumption of the Assets and Assumed Liabilities pursuant to this Agreement under sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

4.18 <u>Compliance with Laws</u>. Each Seller (i) has complied with, is in compliance with and has operated the Business defined in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business. No Seller has received any written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit. Each Seller is in material compliance with the terms of the Permits.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as of the date hereof as follows:

5.1 <u>Limited Liability Company Organization</u>. Buyer is a duly organized and validly existing and in good standing under the Laws of Delaware. Buyer has all requisite power and authority to own its properties and assets and to conduct its business as now conducted and as contemplated upon the acquisition of the Acquired Assets.[Confirm]

5.2 <u>Authorization and Validity</u>. Buyer has all requisite power and authority to enter into this Agreement and to execute and deliver this Agreement and any Ancillary Agreement to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement, the Ancillary Agreements and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action on behalf of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement and the Ancillary Agreements have

been duly executed by Buyer and, subject to Bankruptcy Court approval, constitutes its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

        5.3    <u>No Conflict or Violation</u>.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements do not and will not violate or conflict with any provision of the Organizational Documents of Buyer and do not and will not violate any provision of Law, or any Order applicable to Buyer, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

        5.4    <u>Consents, Approvals and Notifications</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by Buyer do not require the Consent of, or filing with or notification of, any Government or any other Person, the failure of which to obtain, file or notify would reasonably be expected to materially impair the ability of Buyer to consummate the transaction contemplated by this Agreement.

        5.5    <u>Availability of Funds</u>.  On the Closing Date, Buyer will have, sufficient funds available to consummate the transactions contemplated by this Agreement.

**ARTICLE 6**
**COVENANTS OF SELLER**

        Seller hereby covenants to Buyer as follows:

        6.1    <u>Actions Before Closing</u>.  Seller shall use commercially reasonable efforts to perform and satisfy all conditions to Buyer's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Seller under this Agreement.

        6.2    <u>Conduct of Business Prior to Closing.</u>  Except as expressly contemplated by this Agreement, and except to the extent expressly required under the Loan Agreement, the DIP Order, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

        (a)    without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not take any action that would constitute or result in an Event of Default (as defined therein) under the Loan Agreement;

        (b)    without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business or the use of cash collateral in accordance with the DIP Order;

(c)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Liens and Liens granted in connection with the DIP Agreement;

(d)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

(e)     Seller shall notify Buyer promptly in writing of any Material Adverse Effect;

(f)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not make any promise or representation, oral or written, or otherwise, (x) to increase the annual level of compensation payable or to become payable by Seller to any of their directors or Business Employees, (y) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) to enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving a director or Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing as of the date hereof;

(g)     Seller shall comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset;

(h)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any Contract material to Seller (taken as a whole) to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets or assume, amend, modify or terminate any Contract to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (including any Assigned Contract);

(i)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(j)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any commitment for capital expenditures except pursuant to any budget approved by the Lenders under the Loan Agreement and the DIP Order;

(k)     without Buyer's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not terminate, amend or modify in any manner any lease for Leased Real Property;

(l)     Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) maintain the existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of their product prices or pricing policies (e.g., discount policies) for any of their products except as shall be necessary to meet competition or customer requirements;

(m)     Seller shall at all times maintain, preserve and protect all of their material Intellectual Property Rights, and preserve all the remainder of their material property, in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(n)     Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.3    <u>Consents and Approvals.</u>  Seller shall obtain all necessary consents and approvals identified by Buyer prior to Closing.

6.4    <u>Access to Properties and Records; Confidentiality</u>. Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 12) to all books and records of Seller relating to the Business if (w) permitted under Law, (x) such books and records are not subject to confidentiality agreements, or (y) disclosing such books and records would not adversely affect any attorney client, work product or other legal privilege; provided that (i) Seller shall use its commercially reasonable efforts to provide such information to Buyer, and (ii) Seller will, at a minimum, inform Buyer of the estimated exposure[Confirm?], if any, of Buyer in the matters to which such information relates. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, during normal business hours, to the Business, all operations of the Business and to all Acquired Assets throughout the period prior to the Closing Date.

6.5    <u>Further Assurances</u>. Upon the request and at the sole expense of Buyer or Seller, as applicable, at any time after the Closing Date, Seller or Buyer, as applicable, shall execute and deliver such documents or take such actions as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement including, without limitation, conveying to Buyer following the Closing Date all Acquired Assets of Seller that should have been, but were not, conveyed to Buyer on the Closing Date.

6.6    <u>Payments and Revenues</u>. If after the Closing, Seller (or any Related Person or any Affiliate of Seller) shall receive any payment or revenue that belongs to Buyer pursuant to this Agreement, Seller shall promptly remit or cause to be remitted the same to Buyer.

6.7    <u>Preservation of Business Records</u>. After the Closing Date, Seller shall provide to Buyer (after reasonable notice and during normal business hours and without charge to Buyer) access to all Eligible Records retained by Seller for periods prior to the Closing and shall preserve such Eligible Records until the Bankruptcy Court enters an order closing the Bankruptcy Cases. Such access shall include access to any such information in electronic form. With respect to any litigation and claims against Buyer that are related to Excluded Assets or Excluded Liabilities, Seller shall render all reasonable assistance that Buyer may request in defending such litigation or claim, <u>provided</u>, <u>however</u>, that such assistance shall be at no cost to Seller.

6.8    <u>Casualty</u>. If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Buyer shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.9    <u>Name Change</u>. If requested by Buyer, Seller will deliver to Buyer a duly and properly authorized and executed evidence (in form and substance satisfactory to Buyer) as to the amendment of such Seller's organizational documents (collectively, the **"Organizational Amendments"**) changing each Seller's name to another name which does not include any of the following words "Stant," "Standard" or "Thomson". Upon the Closing, each Seller hereby

irrevocably authorizes Buyer's to file the Organizational Amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business on each such Seller's behalf. Furthermore, after the Closing, each Seller shall discontinue the use of its current name (and any other tradenames currently utilized by any of the Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Stant," "Standard" or "Thomson" without the prior written consent of Buyers. From and after the Closing, each of the Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property Rights utilized by any of the Sellers in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder.

## ARTICLE 7
## COVENANTS OF BUYER

Buyer hereby covenants to Seller as follows:

7.1     <u>Actions Before Closing Date</u>.  Buyer shall use its commercially reasonable efforts to perform and satisfy all conditions to Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyer under this Agreement.

7.2     <u>Consents, Approvals and Notifications</u>.  Buyer shall use all commercially reasonable efforts to obtain all Consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer and provide notifications to all Persons required to be notified by Buyer to effect the transactions contemplated by this Agreement.

7.3     <u>Availability of Business Records and Transferred Employees</u>.  After the Closing Date, Buyer shall provide to Seller and Related Persons (after reasonable notice and during normal business hours and without charge to Seller) access to all Business Records for periods prior to the Closing and shall preserve such Business Records until the Bankruptcy Court enters an order closing the Bankruptcy Cases.  Such access shall include access to any such information in electronic form to the extent reasonably available.  Buyer acknowledges that Seller has the right to retain originals or copies of Business Records for periods prior to the Closing.  Prior to destroying any Business Records for periods prior to the Closing, Buyer shall notify Seller, thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyer will permit Seller to retain such Business Records.  With respect to any litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller, Buyer's personnel or Transferred Employees most knowledgeable about the matter in question.

7.4     <u>Notices</u>.  Buyer shall provide Seller with prompt written notice of Buyer's knowledge of (i) any breach of any representation or warranty or failure to comply with or satisfy any covenant by Seller or Buyer or (ii) any other material failure by Seller or Buyer to comply with the obligations of this Agreement.

7.5　Payments and Revenues.　If after the Closing, Buyer (or any Affiliate of Buyer) shall receive any payment or revenue that belongs to Seller pursuant to this Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller, without set-off or deduction of any kind or nature.

## ARTICLE 8
## EMPLOYEES AND EMPLOYEE BENEFITS; RELEASES

8.1　Employment.

(a)　Employees.　Buyer may, but shall not be obligated to offer employment to any and all individuals employed by Seller in connection with the Business as of the Closing Date (the "*Employees*") to commence immediately following the Closing, and any such offer shall be (i) contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing, and (ii) based on terms and conditions of employment as Buyer may offer in its sole and absolute discretion.　For purposes of Section 8.1(a), only Employees who accept Buyer's offer of employment and who commence employment with Buyer shall be referred to herein as the "*Transferred Employees*."

(b)　Standard Procedure.　Pursuant to the "Standard Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, if applicable, (i) Buyer and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Transferred Employees are employed by Buyer that includes the Closing Date, excluding the portion of such year that such Transferred Employee was employed by Seller.

(c)　With respect to any of Seller's employees who become employed by Buyer, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to the Buyer its rights concerning obligations not to disclose confidential information relating to the Business and all obligations not to compete with the Business that each such Employee owes to Seller.

(d)　Except as expressly provided herein, nothing herein shall be construed as transferring to Buyer (i) any Contract, Collective Bargaining Agreement, or agreement with or concerning any current or former employee of Seller or for the employment of any Person or engagement of any independent contractor by Seller or (ii) any rights or

obligations Seller may owe to or be owed by any current or former employee, officer, director, consultant, independent contractor or agent of Seller. Accordingly, Buyer shall not in any way be obligated to assume, adopt, or accept any Collective Bargaining Agreement applicable to Seller's Employees.

(e)     Nothing herein, express or implied, shall confer upon any employee or former employee of Seller any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Seller.

(f)     With respect to any of Seller's current Employees who, at or after the time of Closing, is not offered employment, not hired, or not otherwise employed by Buyer, the employment of each such Employee with Seller shall be deemed terminated as of the date immediately preceding the Closing Date, and Buyer shall have no obligations or responsibilities of any kind for, and Seller shall remain or be solely obligated and responsible for, any and all liability, claims, actions, damages, judgments, penalties, costs, and expenses that may arise in connection with said termination and Seller's employment of said Employee, including without limitation, claims for wages, severance, benefits, or notice pay, or for failure to provide notice under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, et seq. or other similar law.

        8.2     Release. Except as expressly set forth in this Agreement, upon entry of the Sale Order and consummation of the sale to Buyer (the "*Effective Date*"), Buyer, and its Affiliates, representatives, agents, counsel, advisors, successors and assigns shall be unconditionally and irrevocably released by the Seller, their estates and/or their respective representatives, agents, successors and assigns from and against from any and all direct, indirect or derivative claims, obligations, suits, judgments, liens, interests, damages, rights, causes of action, liabilities, claims or rights of contribution and indemnification, and all other controversies of every type, kind, nature, description or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place from the Petition Date to the Effective Date arising from or relating in any way, directly or indirectly, to the Seller, their property, assets, operations or liabilities, and the Bankruptcy Cases. The Sale Order shall contain releases in accordance with this Section 8.2 satisfactory to the Buyer in its sole and absolute discretion.

## ARTICLE 9
## BANKRUPTCY COURT APPROVAL

9.1     Expense Reimbursement.    In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of the Seller, in the event that the Seller sells, transfers, leases or otherwise disposes directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction, all or substantially all or a material portion of the Acquired Assets, to a Person other than Buyer, in a transaction or series of transactions (an "*Alternative Transaction*"), Seller shall pay from the proceeds of the Alternative Transaction, in cash in immediately available funds to Buyers, an expense reimbursement equal to the reasonable actual costs and reasonable actual out-of-pocket fees and expenses of counsel, accountants, financial and other advisors incurred by Buyer in connection with their legal, financial and business due diligence and the preparation and negotiation of this Agreement and any Ancillary Agreements, not to exceed Three Hundred Thousand dollars ($300,000.00) (the "*Expense Reimbursement*"); provided that in no event shall the Expense Reimbursement be payable to Buyer if: (i) this Agreement is terminated by Seller pursuant to Article 12 (except for a termination pursuant to Section 12.2(b)(iii), (iv) or (v) relating to an Alternative Transaction), or (ii) the Seller sells, transfers, leases or otherwise disposes directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction, all or substantially all or a material portion of the Acquired Assets, to the Agent. Seller's obligation to pay the Expense Reimbursement shall survive termination of this Agreement shall be payable upon receipt of detailed invoices supporting the requested Expense Reimbursement at the closing of the Alternative Transaction. The Expense Reimbursement shall be payable as soon as possible in accordance with this Agreement and the Bidding Procedures Motion (as defined below) after the consummation and from the proceeds of an Alternative Transaction.

9.2     Bankruptcy Court Approval.    The sale contemplated herein is subject to competitive bidding and approval by the Bankruptcy Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "*Sale Hearing*"). In conjunction with this Agreement, Seller shall submit for Bankruptcy Court approval, a motion (the "*Bidding Procedures Motion*") and order (the "*Bidding Procedures Order*"), in form and substance satisfactory to Buyer and Seller, seeking approval of certain bidding procedures that is designed to compensate Buyer for its efforts and agreements to date and to facilitate a full and fair process designed to maximize the value of the Acquired Assets for the benefit of the Seller's stakeholders.

9.3     Certain Bankruptcy Undertakings by Seller.

(a)     Seller shall use its best efforts to effect the transactions contemplated by this Agreement in accordance with the Bidding Procedures Order and the Sale Order.

(b)     Seller agrees to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Acquired Assets or any other

agreement contemplated hereby and to consummate the transaction contemplated hereby.

(c)     From and after the date hereof, except as specifically set forth in this Agreement, or as otherwise required by applicable law, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or any Order of the Bankruptcy Court, Seller shall not take any action, or fail to take any action, which action or failure to act would reasonably be expected to: (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification of the Bidding Procedure Order or Sale Order (in any manner that would reasonably be expected to materially and adversely affect Buyer's rights hereunder) or (B) the entry of a stay pending appeal of such order; provided however, that Seller shall not be prevented by this Section from marketing the Acquired Assets to third parties or providing information to or responding to inquiries form potential bidders for the Acquired Assets prior to the Auction.

## ARTICLE 10
## TAXES

10.1   Taxes Related to Purchase of Assets.  All state and local sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes in connection with the transfer of the Acquired Assets and the assumption of the Assumed Liabilities (other than any such Taxes that constitutes a franchise Tax or is otherwise imposed in lieu of an income tax), and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets (collectively, "*Transaction Taxes*"), shall be paid by Buyer on or prior to their due date.

10.2   Proration of Real and Personal Property Taxes.  All real and personal property taxes and assessments on the Acquired Assets for any taxable period commencing on or prior to the Closing Date (the "*Adjustment Date*") and ending on or after the Adjustment Date (a "*Straddle Period*") shall be prorated between Buyer and Seller as of the close of business on the Adjustment Date based on the best information then available, with (a) Seller being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Adjustment Date and (b) Buyer being liable for such Taxes attributable to any portion of a Straddle Period beginning on or after the Adjustment Date.  Information available after the Adjustment Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Buyer and Seller as set forth in the next sentence.  All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Adjustment Date shall be allocated to Seller based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period beginning after the Adjustment Date shall be allocated to Buyer based upon the number of days in the Straddle Period from and after the Adjustment Date; provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code.  The amount of all such

prorations that must be paid in order to convey the Acquired Assets to Buyer free and clear of all Liens other than Permitted Liens shall be calculated and paid on the Closing Date; all other prorations shall be calculated and paid as soon as practicable thereafter.

10.3 <u>Cooperation on Tax Matters</u>. Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably requested, including, without limitation, (a) for the preparation by such other party of any Tax Returns or (b) in connection with any Tax audit or proceeding including one party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

10.4 <u>Retention of Tax Records</u>. Subject to Section 3.2(d) of this Agreement, after the Closing Date and until the expiration of all statutes of limitation applicable to Seller's liabilities for Taxes, Buyer shall retain possession of all accounting, business, financial and Tax records and information that (a) relate to the Acquired Assets and are in existence on the Closing Date and (b) come into existence after the Closing Date but relate to the Acquired Assets before the Closing Date, and Buyer shall give Seller notice and a reasonable opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them during such period. After the Closing Date and until the expiration of all statutes of limitations applicable to Seller's liabilities for Taxes, Seller shall retain possession of all accounting, business, financial and Tax records and information that relate to the Retained Liabilities. In addition, from and after the Closing Date, Buyer shall provide to Seller and its Affiliates (after reasonable notice and during normal business hours and without charge to Seller) access to the books, records, documents and other information relating to the Acquired Assets as Seller may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute and defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer. Such access shall include access to any computerized information systems that contain data regarding the Acquired Assets.

10.5 <u>Unbilled Transactional Taxes</u>. If a Tax assessment is levied upon the Seller by an authorized tax jurisdiction for unbilled transactional Taxes that are the obligation of the Buyer under this Agreement, then the Buyer shall reimburse the Seller for those taxes including any interest and penalty (other than any interest and penalties that are due to the actions, or inaction, of the assessed party).

## ARTICLE 11
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

11.1 <u>Conditions Precedent to Performance by Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

(a) <u>Representations and Warranties of Buyer</u>. All representations and warranties made by Buyer in this Agreement shall be

true and correct in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date (or, if made as of a specific date in the text of such representations and warranties, at and as of such date, provided that for purposes of this Section 11.1(a), the reference to "as the date hereof" in the first sentence of Article 5 shall be disregarded), and Seller shall have received a certificate dated as of the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(b)     Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(c)     Buyer's Deliveries.  Buyer shall have delivered, and Seller shall have received, all of the items set forth in Section 3.3.

11.2     Conditions Precedent to the Performance by Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

(a)     Representations and Warranties of Seller.  The representations and warranties made by Seller in Article 4 of this Agreement shall be true and correct in all material respects as of the Closing, in each case as though made at and as of such time (or, if made as of a specific date, at and as of such date, provided that for purposes of this Section 11.2(a), the reference to "as of the date hereof" in the first sentence of Article 4 shall be disregarded), and Buyer shall have received a certificate dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(b)     Performance of the Obligations of Seller.  Seller shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date, and Buyer shall have received a certificate dated the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(c)     Receipt of Assigned Contracts.  Seller has made Buyer aware in writing of any material Contracts entered into in the past year.

(d)     Seller's Deliveries.  Seller shall have delivered, and Buyer shall have received, all of the items set forth in Section 3.2.

(e)    <u>Consents and Approvals</u>.

(i)    <u>Consents under Assigned Contracts</u>.  On or prior to the Closing Date, Seller shall have obtained any required third party consents to assignment of the Assigned Contracts  (it being understood that, notwithstanding the terms of any Assigned Contract, no consent of any third party will be required if, under the Bankruptcy Code, the Assigned Contract may be assigned without obtaining such a consent).

(ii)    <u>Other Consents and Approvals</u>.  On or prior to the Closing Date, Seller shall have obtained all other required approvals, consents and authorizations or Governmental Authorities necessary to consummate the Proposed Transactions.

(f)    <u>Validity of Contracts and Cure of Default</u>.  On or prior to the Closing Date, all of the Assigned Contracts  shall be in full force and effect, enforceable and assignable to and assumable by Buyer and all of Seller's breaches and defaults, if any, thereunder shall have been cured by Buyer, or by Seller at Buyer's expense in a manner satisfactory to Buyer.

(g)    <u>Sale Motion</u>.  On or prior to July 27, 2009, the Sale Motion shall have been filed by Seller in the Bankruptcy Case.

(h)    <u>Bidding Procedures Order</u>.  On or prior to August 17, 2009 the Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(i)    <u>Sale Order</u>.  On or prior to September 18, 2009, the Sale Order shall have been entered in the Bankruptcy Case, and the effectiveness of the Sale Order shall not have been modified, reversed, vacated, stayed, restrained or enjoined on the Closing Date.

(j)    <u>Closing Deliveries</u>.  On or prior to the Closing Date, Seller shall have delivered to Buyer the items set forth in Section 3.2.

(k)    <u>Representations and Warranties of Seller</u>.  Each of the representations and warranties of Seller set forth in Article 4 of this Agreement shall be true and correct in all material respects (other than such representations and warranties that are qualified as to materiality, which shall be true and correct in all respects) as of the date hereof, and shall be true and correct in all material respects (other than such representations and warranties that are qualified as to materiality, which shall be true and correct in all respects) at and as of the Closing Date with the same force and effect as though newly made as of that date.

(l) <u>Covenants of Seller</u>. On or prior to the Closing Date, Seller shall have performed all of its obligations under this Agreement and all other agreements and instruments to be executed by Seller in connection herewith in all material respects, that, by the terms of such obligations, are to be performed or complied with on or before the Closing Date.

(m) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement or any Ancillary Agreements invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect.

(n) <u>Entry of Approval Order</u>. The Sale Order shall have been entered by the Bankruptcy Court approving the transactions contemplated under this Agreement in a form satisfactory to Buyer and Seller. The Sale Order shall include a provision approving these Transactions under Section 363(m) or the Bankruptcy Code and the order shall not be subject to any subsequent order by any Court of competent jurisdiction staying the effectiveness of the order as of the date and time scheduled for closing.

11.3     <u>No Material Adverse Effect</u>. There shall not have occurred on or prior to the Closing Date any Material Adverse Effect since the date hereof.

11.4     <u>Employment Agreements</u>. Buyer shall have entered into mutually satisfactory employment agreements with the current senior management of Seller.

## ARTICLE 12
## TERMINATION AND EFFECT OF TERMINATION

12.1     <u>Right of Termination</u>. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 12. In the case of any such termination, the terminating party shall give notice to the other party specifying the provision pursuant to which the Agreement is being terminated.

12.2     <u>Termination Without Default</u>.

(a) This Agreement may be terminated at any time before Closing:

(i) by mutual written consent of Seller and Buyer;

(b) automatically and without any action or notice by either the Seller to Buyers, or Buyers to Seller, immediately upon:

(i) if the Proposed Transactions have not been consummated by December 31, 2009 (the ***"Termination Date"***); <u>provided</u>, <u>however</u>, that no termination right shall vest if the failure to consummate the Proposed Transactions

is due to material breach by the party attempting to terminate this Agreement;

(ii)     the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(iii)     approval by the Bankruptcy Court of an Alternative Transaction;

(iv)     acceptance by Seller of an Alternative Transaction; or

(v)     Buyer is not declared the winning bidder upon completion of the Auction.

(c)     by Buyer:

(i)     if the Bidding Procedures Order in a form acceptable to Buyer shall not have been entered by August 17, 2009, unless agreed to in writing by Buyer;

(ii)     if the Auction has not concluded by August 17, 2009, unless agreed to in writing by Buyers;

(iii)     if the Bankruptcy Court has not entered the Sale Order by September 18, 2009 (or such later date as Buyer may have designated in writing to Seller);

(iv)     if there has been a material violation or breach by any Seller of any material representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Buyer impossible or is not curable or, if curable, has not been cured within five (5) business days following receipt by Seller of written notice of such breach from Buyer, and (y) has not been waived by Buyer;

(v)     at any time after September 30, 2009, if the Closing shall not have occurred and such failure to close is not caused by or the result of Buyer's breach of this Agreement;

(vi)     if, prior to the Closing Date, Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vii)    if the Buyer's obligations under the Loan Agreement are terminated;

(viii)    if either of the Interim or Final Order authorizing and approving the Loan Agreement has not been entered within the time periods set forth therein, unless agreed to in writing by Buyer; or

(ix)    if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Buyer in their absolute discretion, prevent them from effectively operating the Business.

(d)    by Seller:

(i)    if any condition contained in Section 11.1 has not been satisfied or waived, after five (5) business days written notice (the *"Default Notice Period"*) to Buyer that Buyer is in default of this Agreement, provided, however, that Buyer does not cure the default within the Default Notice Period, or, upon the closing of an Alternative Transaction and the payment to Buyer of the Expense Reimbursement; provided, however, Seller shall not have the right to terminate this Agreement under this Section 12.2(d) if Seller's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date.

(e)    If this Agreement is terminated pursuant to Section 12.2(a), (i), this Agreement shall become null and void and have no effect (other than this Article 12, which shall survive termination) and (ii) none of Seller, Buyer or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

12.3    Expense Reimbursement.

(a)    If this Agreement is terminated pursuant to (x) Section 12.2(b)(i)-(v), solely if the event specified in such applicable Section occurs as a direct result of any Seller's actions or inactions, or (y) Section 12.2(c)((iv)-(ix), Buyer shall be deemed to have earned the Expense Reimbursement.

(b)     Buyer shall have no right to the Expense Reimbursement if this Agreement is terminated pursuant to Section 12.2(d) above.

(c)     The Expense Reimbursement shall be paid in Cash, without further order of the Bankruptcy Court.

(d)     Seller hereby acknowledge that the obligation to pay the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.

12.4     Effect of Failure of Buyer's Conditions to Closing. Buyer may terminate this Agreement at any time after the Termination Date and before Closing if any condition contained in Section 11.2, has not been satisfied or waived by Buyer as of such time; provided, however, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 12.4 if Buyer's failure to fulfill any of its obligations under this Agreement has been the reason that the Closing has not been consummated on or before such date.

### ARTICLE 13
### MISCELLANEOUS

13.1     Successors and Assigns. Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect. Notwithstanding the foregoing, Buyer may assign all or any portion of its rights and obligations under this Agreement to any of its Affiliates. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

13.2     Governing Law; Jurisdiction. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of Laws thereof), provided that, the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the Laws of the jurisdiction in which such property is located. The parties agree that the Bankruptcy Court shall retain jurisdiction over any legal action or proceeding with respect to this Agreement. Each of the parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

13.3     Warranties Exclusive. The representations and warranties contained herein and in the Ancillary Agreements are the only representations or warranties given by Seller and all other express or implied warranties are disclaimed. All such representations and warranties shall terminate upon the consummation of the Closing. Without limiting the foregoing, Buyer acknowledges that the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability, usage or suitability or fitness for a

particular purpose are disclaimed. Without limiting the foregoing, Buyer further acknowledges that no material or information provided by or communications made by Seller or its agents will create any representation or warranty of any kind, whether express or implied, with respect to the Acquired Assets and the title thereto, the operation of the Acquired Assets, or the prospects (financial and otherwise), risks and other incidents of the Business.

13.4 <u>Mutual Drafting</u>. This Agreement is the result of the joint efforts of Buyer and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

13.5 <u>Expenses</u>. Except as otherwise provided herein or in any order of the Bankruptcy Court with respect to the Buyer, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees, whether or not the transactions contemplated hereby are consummated, except as provided in Section 9.1. Seller shall pay the cost of all Transaction Taxes payable upon or in connection with, and all surveys, title insurance policies and title reports obtained in connection with, this Agreement and the transactions contemplated hereby.

13.6 <u>Broker's and Finder's Fees</u>. Each of the parties represents and warrants that it has not dealt with any broker or finder in connection with any of the transactions contemplated by this Agreement in a manner so as to give rise to any claims against the other party for any brokerage commission, finder's fees or other similar payout.

13.7 <u>Severability</u>. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

13.8 <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Stant Parent Corporation
1620 Columbia Avenue
Connersville, IN 47331-1696

Attention: Philip Fitzpatrick
Facsimile: (765) 825-0285

With a copy to:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attention: Nancy A. Mitchell, Esq.
Facsimile: (212) 801-6400


If to Buyer:

Vapor Acquisition Corp.
1001 Brickell Bay Drive
32nd Floor
Miami, Florida 33131
Attention: Lewis Schoenwetter and Roman Krislav
Facsimile: (305) 379-2013

With a copy to:

Landis Rath & Cobb, LLP
919 Market Street, Suite 1800
Wilmington, DE 19899
Attention: William E. Chipman, Jr., Esq.
Facsimile: (302) 467-4450

Any party may change its address for the purpose of this Section 13.8 by giving the other party written notice of its new address in the manner set forth above.

13.9   Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

13.10   Public Announcements.  No party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other parties, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court, or is reasonably necessary for approval of this Transaction by the Bankruptcy Court.  If any such announcement or other disclosure is required

by Law or Order of the Bankruptcy Court, the disclosing party shall give the nondisclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure.

13.11 <u>Entire Agreement</u>. This Agreement and the Ancillary Agreements contain the entire understanding among the parties hereto with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

13.12 <u>Parties in Interest</u>. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and the Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

13.13 <u>DAMAGES</u>. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

13.14 <u>Headings</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

13.15 <u>Construction</u>. Unless the context of this Agreement otherwise requires, (i) words of any gender include the other gender, (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement as a whole and not to any other particular article, section or other subdivision, (iv) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (v) "shall," "will," or "agrees" are mandatory, and "may" is permissive, and (vi) "or" is not exclusive.

13.16 <u>Currency</u>. Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States currency.

13.17 <u>Time of Essence</u>. Time is of the essence of this Agreement. When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

13.18 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. This Agreement and any signed agreement entered into in connection herewith or contemplated

hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile (or equivalent electronic transmission), shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

## ARTICLE 14
## DEFINITIONS

14.1    Certain Terms Defined.    As used in this Agreement, the following terms shall have the following meanings:

"*Accounts Receivable*" is defined in Section 1.1(j).

"*Acquired Assets*" is defined in Section 1.1.

"*Acquired Intellectual Property*" is defined in Section 1.1(g).

"*Action*" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"*Adjustment Date*" is defined in Section 10.2.

"*Administrative Claim*" shall mean an Allowed Claim under sections 503(b) and 1114(e)(2) of the Bankruptcy Code or determined to be an Allowed Administrative Claim by a Final Order that is entitled to priority under sections 507(a)(1) or 507(b) of the Bankruptcy Code, including any allowed Reclamation Claims or Claims allowed under Section 503(b)(9) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Cases including, without limitation, any actual and necessary expenses of operating the businesses of the Seller or preserving the estates incurred after the Petition Date, and any and all fees and expenses of Professionals Filed under sections 330, 331 or 503 of the Bankruptcy Code.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such first Person where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through the ownership of voting securities, by contract, as trustee, executor or otherwise.

"*Agent*" means GMAC Commercial Finance LLC, in its capacity as agent for the Lenders party to the Loan Agreement.

"*Agreement*" means this Asset Purchase Agreement.

"*Alternative Transaction*" means a transaction or series of related transactions pursuant to which the Seller (i) accept a Qualified Bid (as defined in the Bidding Procedures Order), other than that of Buyers, as the highest or best offer, or (ii) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including but not limited to a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets

(or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyers, or seek to do any of the foregoing as set forth in this clause (ii).

"*Allowed Claim*" shall mean: (a) any Claim, proof of which is/was Filed with the Bankruptcy Court or the Claims Agent on or before the date designated by the Bankruptcy Court as of the last date(s) for filing proofs of claim with respect to such Claim, or which has been or hereafter is scheduled by the Seller as liquidated in amount and not disputed or contingent and which, in either case, is a Claim as to which no objection to the allowance thereof has been Filed within the applicable period of limitation (if any) for objection to Claims fixed by the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court (allowing such Claim in whole or in part); (b) a Claim that is allowed (i) in any contract, instrument, or other agreement entered into in connection with any plan of reorganization, (ii) in a Final Order or (iii) pursuant to the terms of any plan of reorganization; or (c) a request for payment of an Administrative Claim, which is made before any administrative claims bar date, or otherwise has been deemed timely asserted under applicable law. Except as otherwise provided herein, in accordance with section 502(d) of the Bankruptcy Code, a Claim held by any party that is subject to an Avoidance Action shall not be an Allowed Claim until such time as a Final Order is entered by the Bankruptcy Court on the Avoidance Action.

"*Ancillary Agreement*" means, collectively, any agreement to be executed in connection with the transactions contemplated by this Agreement.

"*Assigned Contracts*" is defined in Section 1.1(e).

"*Assigned Real Property*" is defined in Section 1.1(c).

"*Assigned Real Property Conveyance Documents*" means the documents in customary form to be agreed upon between Buyer and Seller prior to the Closing Date, pursuant to which the Seller will, at the Closing Date, sell and assign all of its rights, title and interest to the Assigned Real Property to Buyer in accordance with this Agreement.

"*Assignment and Assumption Agreement*" is defined in Section 3.2(b).

"*Assumed Liabilities*" is defined in Section 1.3.

"*Auction*" means a public sale in which the Acquired Assets shall be offered for sale to a bidder or bidders making the highest or best offer, which will be scheduled by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"*Avoidance Actions*" means any and all claims and causes of action of the Seller, arising under the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549 and 550 thereof, but not including any claim or cause of action against the Professionals or any claims or causes of action released under the terms of this Plan, any Order of the Bankruptcy Court or pursuant to other applicable law or agreement.

"*Bankruptcy Cases*" means the Seller Bankruptcy Cases administered under Case Nos. _____, pending in the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101, *et seq.*, as in effect on the Petition Date, and as amended effective as of the Petition Date.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Bankruptcy Cases originally administered in the United States Bankruptcy Court for the District of Delaware.

"**Bidding Procedures Motion**" is defined in Section 9.2.

"**Bidding Procedures Order**" is defined in Section 9.2.

"**Business**" is defined in the Preamble to this Agreement.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by Law or other Government action to close.

"**Business Records**" means all books, files and records to the extent they relate to the Acquired Assets or the Business, including, without limitation, customer lists, historical customer files, reports, plans, data, accounting and tax records, product specifications, drawings, diagrams, training manuals, safety and environmental reports and documents, maintenance schedules, inventory records, business plans and marketing and all other studies, documents and records regardless of location.

"**Buyer**" is defined in the Introduction to this Agreement.

"**Cash**" means cash and cash equivalents, including, but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

"**Claim**" means a claim against any or all of the Seller, whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

"**Claims Agent**" means the **Garden City Group?** appointed by the Bankruptcy Court.

"**Closing**" is defined in Section 3.1.

"**Closing Date**" is defined in Section 3.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means agreements by and between the Seller and labor union representatives on behalf of employees of the Seller with respect to employee benefits, wages, hours and/or working conditions.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee, if any, and as reconstituted from time to time and existing as of the date of the Auction.

"*Consent*" means any consent, approval, authorization, qualification, waiver or notification of a Government or third Person.

"*Contract*" means any written or oral contract, agreement, license, sublicense, lease, sublease, mortgage, instruments, guaranties, commitment, undertaking or other similar arrangement, whether express or implied.

"*Cure Amounts*" has the meaning specified in the Bidding Procedures Order.

"*Customer Contracts*" is defined in Section 1.1(e).

"*Default Notice Period*" is defined in Section 12.2(d)(i).

"*Designation Right Contracts*" is defined in Section 1.5.

"*Designation Right Period*" is defined in Section 1.5.

"*DIP Order*" means the Interim DIP Order and the Final DIP Order.

"*Effective Date*" is defined in Section 8.2.

"*Eligible Records*" means all of the following records of Seller, only to the extent such books and records (i) are existing and in the control and possession of Seller as of the Closing Date (ii) are reasonably accessible by Seller as of the request date: corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records.

"*Employee Benefit Plans*" means any employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and any "multi-employer plan" as defined in Section 3(37) of ERISA or each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option and other equity related compensation plan, program, agreement or arrangement; each medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, change in control, retention or agreement or arrangement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to, or required to be contributed to, by the Seller or an ERISA Affiliate or to which Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any director or employee or former director or employee of the Seller or any former subsidiary of the Seller.

"*Employees*" is defined in Section 8.1(a).

"*Encumbrances*" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to any Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any

shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"*Entitled Real Property*" is defined in Section 1.1(c).

"*Environmental Claim*" means any and all claims of any entity, party or person in any way based upon, resulting from or related to environmental conditions, law, rules, regulations or other matters or impacts to or contamination of environmental media (including groundwater, soil or air), the presence, release or threatened release or migration of or exposure to hazardous materials, substances or wastes, including, without limitation, all claims of the United States Environmental Protection Agency ("**EPA**") under any 106 orders or otherwise, all claims of any state environmental department and all other claims identified on Schedule 4.7 hereof (including, without limitation, claims with respect to studies, testing or investigatory costs, public or private oversight, operation, maintenance or monitoring costs, cleanup costs, response costs, removal costs, remediation costs, containment costs, restoration costs, corrective action costs, closure costs, reclamation costs, natural resource damages, assessment or restoration costs, property damages, business losses, personal injuries, penalties or fines) and any other claims for fines, penalties liability, damages, losses, liabilities, obligations, judgments, assessments, costs, expenses, contribution or indemnity on account of any of the foregoing claims, that may be, have been or could have been asserted against the Seller.

"*Environmental Law*" means the following: (i) any federal, state or local law (including, without limitation, the Commonwealth of Puerto Rico), statute, ordinance, rule, regulation, guideline, code, license, permit, authorization, approval, consent, legal doctrine, order, judgment, decree, injunction, requirement or agreement with any governmental entity, relating to (x) the protection, preservation or restoration of the environment (including, without limitation, air, water, vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Materials. The term Environmental Law includes, without limitation, (i) the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act, the federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Atomic Energy Act, the Nuclear Waste Policy Act of 1982, the federal Occupational Safety and Health Act of 1970, the Puerto Rico Public Policy Environmental Act and regulations promulgated thereunder, each as amended and as now in effect, and (ii) any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

"*EPA*" means the Environmental Protection Agency.

"*Equipment*" is defined in Section 1.1(d).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any entity that with the Seller is: (a) member of a controlled group of corporations within the meaning of Section 414(b) of the IRC Code; (b) a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the IRC Code; (c) a member of an affiliated service group within the meaning of Section 414(m) of the IRC Code; or (d) a member of a group of organizations required to be aggregated under Section 414(o) of the Code.

"*Estate*" or "*Estates*" means the estate of each or the estates of all of the Seller.

"*Excluded Assets*" is defined in Section 1.2.

"*Excluded Contract*" is defined in Section 4.9.

"*Excluded Liabilities*" is defined in Section 1.4.

"*Expense Reimbursement*" is defined in Section 9.1.

"*FF&E*" means all equipment, machinery, fixtures, furniture and other tangible property owned by Seller located at any Business Location or used or useful in the operation of the Business and Acquired Assets (including all such property that is damaged), including, without limitation, all attachments, appliances, lighting fixtures, signs, doors, partitions, plumbing, heating, air conditioning, wiring, telephones, security systems, carpets, floor coverings, wall coverings, office equipment, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"*Final DIP Order*" means the Orders (A) Authorizing Seller to Obtain Post-Petition Financing and Grant Senior Security Interests and Liens and Super Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c) and (d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing Seller to Enter into Credit Agreements with _____.

"*Final Order*" means an order entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, as to which (i) no appeal, certiorari proceeding or other review reconsideration or rehearing has been requested or is still pending, and (ii) the time for filing a notice of appeal or petition for certiorari or further review reconsideration or rehearing has expired.

"*Government*" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, any state thereof or any foreign government.

"*Hazardous Materials*" or "*Hazardous Substance*" means any substance presently defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise presently regulated under any Environmental Law, whether by type or by quantity, including any

substance containing any such substance as a component. Hazardous Materials includes, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial hazardous or toxic substance or petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos, asbestos containing material, urea formaldehyde foam insulation, lead and polychlorinated biphenyl, and any and all of the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product or constituent presently regulated under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.*; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides presently regulated under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 *et seq.*; asbestos and asbestos-containing materials, PCBs and other substances presently regulated under the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; source material, special nuclear material, by-product material and any other radioactive materials or radioactive wastes, however produced, presently regulated under the Atomic Energy Act or the Nuclear Waste Policy Act of 1982; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. "1910.1200 *et seq.*; and industrial process and pollution control wastes, whether or not hazardous within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*

"*Improvements*" mean the definition in Section 1.1(d).

"*Intellectual Property Licenses*" means (i) any grant by Seller to a third Person of any right to make, use, have made, sell, offer to sell or grant sublicenses to do the foregoing for any of the Acquired Intellectual Property in connection with the Business, and (ii) any grant to Seller of a right to make, use, have made, sell, offer to sell or grant sublicenses to do the foregoing for a third Person's Intellectual Property Rights in connection with the Business.

"*Intellectual Property Rights*" means (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part or reissue patent applications and patents issuing thereon including any foreign counterparts thereof (collectively, "*Patents*"), (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof (collectively, "*Marks*"), (iii) copyrights and registrations and applications therefor and works of authorship and mask work rights (collectively, "*Copyrights*") and (iv) discoveries, concepts, ideas, research and development, know-how, formulae, inventions (whether patentable or unpatentable and whether or not reduced to practice), invention disclosures, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, compositions, manufacturing and production processes and techniques, technical data, procedures, designs, drawings, specifications, databases and other proprietary and confidential information, including customer lists, supplier lists, pricing and cost information and business and marketing plans and proposals of Seller, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein and, in each case, all related technology (collectively, "*Trade Secrets*"), whether presently existing or created or acquired anywhere in the world between the date of this Agreement and the Closing Date.

*"**Interim DIP Order**"* means the Bankruptcy Court's Interim Order (i) Authorizing Continued Secured Post-Petition Financing, (ii) Granting Senior Liens and Superpriority Administrative Expense Status; (iii) Granting Limited Relief from the Automatic Stay, (iv) Scheduling a Final Hearing; and (V) Granting Related Relief.

*"**Inventory**"* is defined in Section 1.1(f).

*"**IRS**"* means the Internal Revenue Service.

*"**Knowledge**"* of Seller with respect to a given matter means the knowledge that the executive officers and senior management of Seller actually possess with respect to the matter, given their respective positions with, and authority with respect to, Seller, after due inquiry in the ordinary course of business.

*"**Law**"* means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

*"**Leased Real Property**"* is defined in Section 1.1(a).

*"**Legal Proceeding**"* means any judicial, administrative or arbitral actions, suits, proceeds (public or private), or claims of any proceedings by or before a court or other Government authority.

*"**Lenders**"* means collectively, those lenders, from time to time, party to the Loan Agreement.

*"**Liability**"* means any debt, liability, commitment or obligation of any kind (whether direct or indirect, known or unknown, fixed, absolute or contingent, matured or unmatured, asserted or not asserted, accrued or unaccrued, liquidated or unliquidated, determined, determinable or otherwise or due or to become due and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto).

*"**Lien**"* means any valid and enforceable mortgage, pledge, charge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, or other legally cognizable security devices of any kind.

*"**Loan Agreement**"* means that certain Loan and Security Agreement dated as of June 18, 2009 among Sellers, GMAC Commercial Finance LLC, as agent, and the lenders party thereto from time to time (collectively, the *"**Lenders**"*), as amended, restated, supplemented or otherwise modified from time to time.

*"**Losses**"* means losses, liabilities, deficiencies, damages, suits, claims, proceedings, fines, judgments, costs or expenses (including attorneys' fees and any amounts paid or incurred in defense of any settlement of any of the foregoing or in connection with any action).

*"**Material Adverse Effect**"* means a state of facts, event, change or effect on the physical condition of the Acquired Assets, or the enforceability of this Agreement or any Ancillary Agreement or any Assigned Contract, that results in a material adverse effect on the ability to

operate or condition of the Business but excluding any state of facts, event, change or effect caused by events, changes or developments relating to: (i) changes of Laws, (ii) strikes, work stoppages or other labor disturbances, (iii) the transactions contemplated by this Agreement or the announcement thereof; (iv) changes or conditions affecting the industries of which the Business is a part generally, so long as these changes do not have a disproportionate impact on the Seller; or (v) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof.

"*Order*" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of the Government.

"*Organizational Amendments*" is defined in Section 6.9.

"*Organizational Documents*" is defined in Section 4.3.

"*Other Contracts*" is defined in Section 1.1(e).

"*Owned Real Property*" is defined in Section 1.1(b).

"*Permits*" means any permits, authorizations, approvals, consents, registrations, certificates and licenses relating to the Business issued by any Government (and pending applications for the foregoing).

"*Permitted Liens*" means: (i) liens related to the Restructured Senior Indebtedness; (ii) statutory Liens for current Taxes, assessments and other Government charges that are not yet due and payable or that, although due and payable, are being contested in good faith; (iii) mechanics', materialmen's, warehouseman's and similar Liens that relate to Assumed Liabilities; (iv) such covenants, conditions, restrictions, easements, encroachments or encumbrances, or any other state of facts, that do not materially interfere with the present occupancy of the Assigned Real Property or the use of such Assigned Real Property as it has been used by Seller in the Business prior to the Closing Date; (v) zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Government having jurisdiction over real property; or (vi) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any of the Real Estate Leases.

"*Person*" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date upon which the Seller files voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court.

"*PMSI Claims*" means any claim of a holder of a purchase money security interest relating to an Acquired Asset, and shall include lease agreements for equipment which constitutes as Acquired Asset and which contains a nominal or one dollar ($1.00) purchase price.

*"Proposed Transations"* means all of the transactions contemplated hereby, including the transfer, sale, conveyance, assignment and delivery by Seller to Buyer, and the acquisition by Buyer from Seller, of substantially all of the assets of Seller as contemplated herein and the performance by the parties of their respective covenants and obligations hereunder.

*"Purchase Price"* is defined in Section 2.1.

*"Real Estate Leases"* is defined in Section 1.1(a).

*"Related Person"* means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

*"Restructured Senior Prepetition Indebtedness"* means all obligations (as such term is defined in the Loan Agreement), including, without limitation, any and all Obligations, liabilities and indebtedness of every nature of each Seller owed to any Lender under an "Interest Rate Agreement", "Security Hedge Agreement" and "Currency Swap Agreement" (as each such term is defined in the Loan Agreement). For the avoidance of doubt, the Restructured Senior Indebtedness includes, without limitation, the $1,320,000 swap obligation owing to the Lenders.

*"Sale Hearing"* is defined in Section 9.2.

*"Sale Order"* means an order of the Bankruptcy Court, in form and substance acceptable to Seller and Buyer, approving, among other things, the Proposed Transactions approving Buyer as the party to purchase the Acquired Assets and the Assigned Contracts and Assumed Liabilities and authorizing Seller to perform all of its obligations hereunder; provided, however, that such order must contain a finding that Buyer has acted in good faith and is entitled to the protections of Bankruptcy Code section 363(m).

*"Seller"* is defined in the Introduction to this Agreement.

*"Seller Intellectual Property"* is defined in Section 4.10.

*"Straddle Period"* is defined in Section 10.2.

*"Supplier Contracts"* is defined in Section 1.1(e).

*"Tax Return"* means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

*"Taxes"* means (i) all taxes, however denominated, and all like charges, levies, duties, imposts or other assessments, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration,

documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date and (ii) any transferee, successor or other liability in respect of Taxes of another (whether by contract or otherwise) and any liability in respect of any Taxes as a result of any company being a member of any "affiliated group" as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign Tax Law.

"***Termination Date***" is defined in Section 12.2(b).

"***Transferred Employee***" is defined in Section 8.1(a).

"***Transaction Taxes***" is defined in Section 10.1.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**STANT PARENT CORP., STANT HOLDING CORP., STANT CORPORATION, STANT MANUFACTURING, INC., STANDARD-THOMSON CORPORATION and THOMSON INTERNATIONAL CORPORATION**

By: _Marlon J Bailey_

Name: Marlon J. Bailey

Title: President & CEO

**VAPOR ACQUISTION CORP.**

By: _____

Name: Lewis Schoenwetter

Title: President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**STANT PARENT CORP., STANT HOLDING CORP., STANT CORPORATION, STANT MANUFACTURING, INC., STANDARD-THOMSON CORPORATION and THOMSON INTERNATIONAL CORPORATION**

By: _____
      Name:  Marlon J. Bailey
      Title:  President & CEO

**VAPOR ACQUISTION CORP.**

By: _____
      Name:  Lewis Schoenwetter
      Title:  President