# EXHIBIT "A"

Proposed Interim Order

| | |
|---|---|
| In re: | Chapter 11 |
| STANT PARENT CORP., *et al.*,[1] | Case No.09-_____ (___)<br>(Joint Administration Pending |
| Debtors. | |

**INTERIM ORDER (I) AUTHORIZING SECURED
POST-PETITION FINANCING, (II) GRANTING SENIOR LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING THE
DEBTORS' USE OF CASH COLLATERAL; (IV) GRANTING LIMITED RELIEF
FROM THE AUTOMATIC STAY, (V) SCHEDULING A FINAL
HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the emergency motion (the "Motion") dated July 27, 2009 of the above-captioned

debtors and debtors in possession (each, individually a "Debtor" and, collectively, the "Debtors")

(a) seeking this Court's authorization pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and

364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"Bankruptcy Code") and Rules 2002, 4001(b), (c) and (d) and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for the Debtors, inter alia, (i) to obtain secured

post-petition loans, advances and other accommodations pursuant to the Pre-Petition Agreements

(defined below), as amended hereby, and the Post-Petition Amendment (defined below), up to an

aggregate principal amount not to exceed $11,000,000 (the "Post-Petition Financing") from

GMAC Commercial Finance LLC, as a lender and agent (in such capacity, the "Agent") for the

lenders (collectively, the "Lenders")[2], (ii) granting the Lenders, pursuant to Bankruptcy Code

---

[1] The Debtors are the following entities: Stant Parent Corp., Stant Holding Corp., Stant Corporation, Stant Manufacturing, Inc., Standard-Thomson Corporation and Thomson International Corporation.

[2] Pursuant to that certain Participation Agreement dated as of July 27, 2009 (the "Participation Agreement"), H.I.G. Capital Partners IV, L.P. ("HIG"), purchased a $6,000,000 participation in the Post-Petition Financing. HIG Stant
(cont'd)

§§ 364(c) and 364(d), security interests in all of the Debtors' presently owned and after-acquired property and Pre-Petition Collateral (as defined below) and (iii) granting the Lenders, pursuant to Bankruptcy Code § 364(c)(1), priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than in respect of the Carve-Out (as defined below); (b) seeking this Court's authorization, pursuant to Bankruptcy Code § 363(c), to use Cash Collateral (as defined below) and, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), to provide adequate protection to the Lenders with respect to any diminution in the value of the Lenders' interest in the Pre-Petition Collateral resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d) to secure the Post-Petition Financing, the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a); and (c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order authorizing on a final basis, inter alia, the Post-Petition Financing and the use of Cash Collateral (the "Final Order"); an interim hearing (the "Interim Hearing") having been held before this Court; due and sufficient notice of the Motion and the Interim Hearing having been given; and upon the entire record made at the Interim Hearing, and this Court having found good and sufficient cause appearing therefore,

THE DEBTORS AND THE LENDERS STIPULATE TO EACH OF PARAGRAPHS A THROUGH M BELOW, AND BASED UPON SUCH STIPULATION, THE COURT FINDS AND CONCLUDES THAT:

---

(cont'd)
IV, LLC, an affiliate of HIG, is the majority shareholder of Stant Parent Corp. None of the HIG entities are affiliated with the Agent or the Lenders.

A.	On July 27, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are continuing in possession of their property, and operating and managing their businesses pursuant to Bankruptcy Code §§ 1107(a) and 1108.

B.	This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.	Without prejudice to the rights of any other party (but subject to the limitations thereon described in ¶11 below), the Debtors acknowledge, stipulate and confirm the following:

(a)	On or about June 18, 2008, Stant Holding Corp. ("Stant Holding"), Stant Corporation ("Stant"), Standard-Thomson Corporation ("STC"), Thomson International Corporation ("Thomson"), Stant Manufacturing, Inc. ("Stant Manufacturing"); and together with Stant Holding, Stant, STC and Thomson, individually, each a "Borrower," and collectively, the ("Borrowers"), Stant Parent Corp., as guarantor, the Agent and the Lenders entered into that certain Loan and Security Agreement, a copy of which is attached to the Motion as Exhibit "D" (as the same may have been amended, supplemented or otherwise modified or restated from time to the Petition Date, the "Loan Agreement" and collectively with all prepetition documents executed in connection therewith, the "Pre-Petition Agreements")[3] pursuant to which, *inter alia*, the Lenders agreed to make certain loans and financial accommodations to the Borrowers in the aggregate principal amount of up to $70,000,000 comprised of a revolving credit facility in the principal amount of up to $30,000,000 (including a swingline loan), and a term

---

[3] Capitalized terms not otherwise defined herein shall have the definitions set forth in the Pre-Petition Agreements.

loan facility in the principal amount of $40,000,000, which loans are secured by senior liens on, and security interests in, substantially all of the Debtors' assets, including, without limitation, all (1) Accounts; (2) Chattel Paper; (3) Commercial Tort Claims; (4) (i) all Deposit Accounts of the Loan Parties and (ii) all cash and other monies and property of any Loan Party in the possession of or under the control of the Agent or any Lender; (5) Documents; (6) Equipment; (7) Fixtures; (8) General Intangibles (including Intellectual Property); (9) Goods; (10) Instruments; (11) Inventory; (12) Investment Property; (13) Letter-of-Credit Rights and Supporting Obligations; (14) other personal property; (15) Mortgaged Property; (16) all books, records, ledger cards, files, correspondence, computer programs, tapes, disks and related data processing software that at any time evidence or contain information relating to any of the property described above or are otherwise necessary or helpful in the collection thereof or realization thereon; (17) Proceeds and products of all or any of the property described above; and (18) the equity interests pledged to the Agent pursuant to the Pledge Agreements, to the extent set forth in the Pledge Agreements (collectively, including Cash Collateral (as defined below), the "Pre-Petition Collateral");

(b)     The Debtors are truly and justly indebted and liable to the Agent and Lenders without defense, counterclaim or offset of any kind in respect of loans made pursuant to the Pre-Petition Agreements, and that as of the Petition Date, such amount equaled approximately $62,051,487.61 (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities), plus (i) outstanding letter of credit exposure, plus (ii) other fees, costs, expenses and indemnities as provided for in the Pre-Petition Agreements (collectively, the "Pre-Petition Indebtedness"); and

4

(c)     The Agent and the Lenders' security interests in, and liens on, the Pre-Petition Collateral were (i) properly perfected and are valid and enforceable first priority liens on and security interests in the Pre-Petition Collateral, subject to the Prior Permitted Liens (as defined below), and (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law.   The Debtors further acknowledge that their cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of the Lenders within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral").   The Lenders are entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of their interest in the Pre-Petition Collateral, including for the use of Cash Collateral and the use, sale or lease of the Pre-Petition Collateral other than Cash Collateral.

D.     Various Defaults and Events of Default have occurred and are continuing under the Pre-Petition Agreements, and as a result, the Lenders have the right, subject to the Pre-Petition Agreements, to accelerate the Pre-Petition Indebtedness, foreclose on the Pre-Petition Collateral (with relief from the automatic stay), and cease advancing funds pursuant to the Loan Agreement.

E.     Absent the Post-Petition Financing and the use of the Cash Collateral, the Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business, pay the expenses of administration of these Cases or maintain their properties and satisfy their debts as they come due.   The Debtors' ability to maintain business relationships with vendors, suppliers and customers, to pay their employees and otherwise finance operations, is essential to the Debtors' continued viability.   In addition, the Debtors' need for financing is immediate.   In the absence of the Post-Petition Financing and the

5

use of the Cash Collateral, the continued operation of the Debtors' businesses would not be possible, causing serious and irreparable harm to the Debtors and their estates.

F.     As further described herein and in the Post-Petition Amendment, the Post-Petition Indebtedness will consist of loans to be made under a newly established "sub-limit" to the revolving facility in existence as of the Petition Date.  Other than borrowings under such sub-limit, there will no post-petition advances under the term loan and revolving facility in existence as of the Petition Date.

G.     Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors cannot obtain unsecured credit allowable under Bankruptcy Code §503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without the Debtors (i) granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), (ii) securing, pursuant to Bankruptcy Code §§ 364(c) and (d), such indebtedness and obligations with security interests in and liens on substantially all (if not all) of the Debtor's personal property, real property and the Pre-Petition Collateral, and (iii) providing for adequate protection of the Lenders' interests.

H.     Notice of the Interim Hearing and the relief requested in the Motion was given to (i) the Office of the United States Trustee, (ii) counsel to the Lenders, (iii) the creditors holding the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis), (iv) counsel to Northstar (defined below), (v) the Office of the United States Trustee for the District of Delaware, (vi) the Internal Revenue Service; (vii) the Securities and Exchange Commission, (viii) counsel to HIG, and (ix) all other known parties asserting a lien on, or security interest in, the Debtors' assets or property (collectively, the "Notice Parties").  Under the circumstances,

such notice of the Interim Hearing and the relief requested in the Motion constitutes adequate and sufficient notice under Bankruptcy Code §§ 105, 362(d), 363(b) and 364(d) and Bankruptcy Rules 2002 and 4001, and no other notice need be given.

I.     At the Interim Hearing, the Court considered representations made by counsel, offers of proof, and/or testimony regarding:

(i)     the negotiations pertaining to this Order;

(ii)    the necessity for this Order;

(iii)   the Debtors' need for credit to the extent necessary to avoid immediate and irreparable harm to their estates; and

(iv)    those expenses necessary to avoid immediate and irreparable harm to its estates.

J.     Based on the record presented to the Court by the Debtors at the Interim Hearing, the Post-Petition Financing has been negotiated in good faith and at arm's length between the Debtors and the Lenders, and any credit extended, and loans made to the Debtors as part of the Post-Petition Financing shall be deemed to have been extended, issued or made, as the case may be, in good faith by the Lenders as required by, and within the meaning of, Bankruptcy Code § 364(e).

K.     Based on the record presented to the Court by the Debtors and the Lenders at the Interim Hearing, the terms of the Post-Petition Financing appear to be fair and reasonable, are ordinary and appropriate for secured financing under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration.

L.     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2). The permission granted herein to enter into the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors and their estates and will allow the Debtors to commence an orderly sale process designed to maximize the value of their assets ("Sale Process"). This Court concludes that entry of this Order is in the best interest of the Debtors' estates and creditors as its implementation will, among other things, provide the Debtors with the necessary liquidity to sustain the operation of their businesses throughout the Sale Process.

M.     No committee of unsecured creditors has been appointed in this case ("Committee").

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES HERETO THAT:

1.     The Motion is granted, subject to the terms and conditions set forth in this Order.

### Post-Petition Loans

2.     The Debtors are hereby authorized to obtain the Post-Petition Financing, use Cash Collateral, and additionally to borrow money and seek other financial accommodations from the Lenders after the Petition Date pursuant to the terms and conditions of (a) this Order (including the Budget (defined below)), (b) the Pre-Petition Agreements, as modified hereby, and (c) the Post-Petition Amendment to Loan and Security Agreement, substantially in the form attached hereto as Exhibit A ("Post-Petition Amendment") (collectively, the "Operative Documents"). The Debtors are authorized to use the proceeds of any such loans ("Loans") made under the Post-Petition Financing, to use Cash Collateral and other Collateral (as defined below), as provided and limited by the Budget, for operation of the Debtors' businesses and the administration of these Chapter 11 Cases (all such Loans shall constitute, the "Post-Petition Indebtedness"),

8

provided, that (i) the proposed Loans or use of Cash Collateral or other Collateral is consistent with the terms of the Operative Documents and will only be used to pay, when due (or, in the case of certain professional fees, when allowed), the expenses set forth in the Budget (subject to the variances set forth in paragraph 5 hereof), and (ii) any requested Post-Petition Financing is necessary only after the use of available Cash Collateral. The aggregate amount of all checks written pre-petition to the extent paid post-petition with the Loans or Cash Collateral, which, pursuant to Order of this Court, are honored post-petition, shall be included as Post-Petition Indebtedness. Notwithstanding anything to the contrary contained herein, prior to the entry of the Final Order, the principal amount of the Post-Petition Indebtedness shall not exceed $7,500,000.

3.      During the term of this Order, the terms of the Pre-Petition Agreements shall continue in full force and effect with respect to the loans and other advances under the Post-Petition Financing, except as otherwise modified hereby or by the Post-Petition Amendment; provided, however, other than the DIP Revolving Overadvances (as that term is defined in the Post-Petition Amendment), the Lenders shall not be required to make any other Advance to, or for the benefit of, the Debtors.

4.      Attached hereto as Exhibit B is an eleven (11) week Budget (the "Budget") for the period from the Petition Date through and including the week of October 10, 2009, which was prepared by the Debtors and consented to by the Requisite Lenders. The Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses which Debtors expect to incur during the Term (as defined below). The Debtors are authorized to use the proceeds of the Post-Petition Indebtedness and the Collateral to pay (a) the items described in the Budget, subject to the terms and conditions set

forth in the Operative Documents (subject to the variances set forth in paragraph 5 hereof); and (b) interest, fees, costs, expenses and other charges payable by the Debtors to the Lenders under the Pre-Petition Agreements (as provided for herein) and the Post-Petition Amendment (regardless of whether such items are set forth in the Budget). Not later than the second (2nd) business day of each week, the Debtors shall provide the Lenders with a variance report reflecting, on a line-item basis, the actual cash disbursements and collections for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and collections from those reflected in the Budget for that period. Collections less than 90% of the amounts projected in the Budget (measured in any consecutive two (2) week period) or any disbursement by the Debtors other than for amounts set forth in the Budget or payments to be made to the Lenders in accordance with the terms of this Order, shall each constitute an Event of Default in accordance with the provisions of this Order unless the Requisite Lenders consents to those changes in writing; provided, however, the Debtors may make payments in excess of the total budgeted disbursements so long as the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10%) of the budgeted disbursements for that week (other than any professional fees for which no variance will be allowed); provided, further, however, to the extent that the full amount of any budgeted expense is not disbursed in a particular week, Debtors may spend such unused amount in any subsequent week, subject to the terms and conditions of this Order. All disbursements by the Debtors shall be reviewed in advance of payment by the Lenders' restructuring consultant or any chief restructuring officer ("CRO") retained by the Debtors (the identity of such CRO to be reasonably acceptable to the Lenders) to ensure that such disbursements are in compliance with the Budget. The Budget may be modified by (a) the agreement of the Debtors and the Lenders, with two (2) days notice to the

Committee (once formed); or (b) further Order of the Court. The Committee may seek expedited relief from this Court regarding any objections it may have to such modified Budget. Notwithstanding the variances permitted by this ¶4, at no time shall the Post-Petition Indebtedness exceed $11,000,000.

5.     As security for the Post-Petition Indebtedness, the Agent and the Lenders are granted, pursuant to Bankruptcy Code § 364(d), as of the Petition Date (without the necessity of the recordation of mortgages, security agreements, pledge agreements, assignments, control agreements, financing statements or otherwise), (a) valid, perfected, priming, first priority senior security interests in, and liens on all property and interests in property acquired by the Debtors and the Debtors' estates from and after the Petition Date, including, without limitation, the following (such property shall collectively be referred to as the "<u>Post-Petition Collateral</u>"): (i) accounts receivable, (ii) equipment, (iii) inventory and other goods, (iv) instruments and documents of title, (v) general intangibles (including, without limitation, all trademarks, patents, rights under licenses (whether as licensor or licensee) and other intellectual property, rights with respect to insurance policies, state, federal and foreign tax and duty refunds, open purchase orders and customer lists), (vi) investment property, (vii) real estate owned by the Debtors, (viii) all monies, securities, cash, cash equivalents contained in deposit accounts maintained by the Debtors, (ix) all other property described in the Pre-Petition Agreements, (x) commercial tort claims, (xi) letter of credit rights, (xii) proceeds from the disposition of leases of real property, (xiii) all books and records (including electronic media) pertaining to the foregoing, (xiv) equity interests in any subsidiaries or affiliates, and (xv) the proceeds and products of all of the foregoing (including, without limitation, if approved at the conclusion of the Final Hearing, recoveries, claims and causes of action, and the proceeds of such recoveries, claims and causes

CHICAGO/#1957218.12

of action arising under the avoidance provisions of Chapter 5 of the Bankruptcy Code limited to the amount of the Post-Petition Indebtedness); and (b) a valid, perfected and senior security interest in, and lien on, the Pre-Petition Collateral, junior only to the PMSI Creditors (defined below). (The Post-Petition Collateral and the Pre-Petition Collateral may hereinafter be referred to as the "Collateral"). Except to the extent expressly set forth in clause (b) of this paragraph, the liens granted pursuant to this Order and the Pre-Petition Agreements to the Agent and the Lenders to secure the Post-Petition Indebtedness shall not be subordinated to or made pari passu with any other lien or security interest. The provisions of any intercreditor agreements or subordination agreements which subordinate liens and security interests to the liens and security interests of the Agent or the Lenders or other indentures which subordinate any claims to the claims of the Agent or the Lenders (including, without limitation, (x) the Subordination and Intercreditor Agreement dated June 18, 2008, between the Agent and Northstar Mezzanine Partners V L.P. ("Northstar"); and (y) the Subordination Agreement dated as of June 18, 2008 by and among the Agent, Tomkins Corporation and Northstar, shall remain in full force and effect, be governed, in all respects, by Bankruptcy Code §510 and shall continue with respect to the liens and security interests granted to the Lenders in the Collateral.

6.     In accordance with Bankruptcy Code §364(c)(1), the Post-Petition Indebtedness shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 (the "Superpriority Claims"), and shall at all times be senior to the rights of the Debtors and any subsequently appointed Chapter 7 or Chapter 11 trustee, and any of the Debtors' creditors. Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy

Code §§ 105, 364(c)(1), 503(b), 507(b) or otherwise, including those resulting from the conversion of any of the Chapter 11 cases pursuant to Bankruptcy Code § 1112, shall be senior to, or *pari passu* with, the Superpriority Claims of the Lenders arising out of the Post-Petition Debt.

7.    The Agent and Lenders are hereby granted as of the Petition Date (without the necessity of the recordation of mortgages, security agreements, pledge agreements, assignments, control agreements, financing statements or otherwise), (i) pursuant to Bankruptcy Code § 364(c)(2), valid and perfected first priority senior security interests in, and liens on, all property of the Debtors' estates (other than the Collateral) that is not otherwise encumbered by a validly perfected security interest or lien senior to security interests and liens of the Lenders, and (ii) pursuant to Bankruptcy Code § 364(c)(3), second priority, junior perfected liens on and security interests in all property of the Debtors' estates, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens (including the Collateral).

8.    The Debtors are authorized and directed to execute, deliver, perform and comply with the terms and covenants of the Operative Documents. The Debtors, the Agent and the Lenders are further authorized to enter into (a) non-material amendments to the Pre-Petition Agreements and the Post-Petition Amendment, without further Order of this Court, provided that prior notice of such amendment is provided to the Committee (once formed), or (b) material amendments to the Pre-Petition Agreements and the Post-Petition Amendment, with the consent of the Committee or upon further Order of this Court. The terms and conditions of the Pre-Petition Agreements (as same may be amended from time to time in accordance with this paragraph) and the Post-Petition Amendment are incorporated into the terms and conditions of

this Order and, together with this Order, shall be sufficient and conclusive evidence of the borrowing arrangements among the Debtors and the Lenders.

## Pre-Petition Debt

9.      The Debtors acknowledge and agree and this Court hereby finds for all purposes in these Chapter 11 Cases, subject only to the rights under ¶11 of this Order that, as of the Petition Date: (a) the Pre-Petition Agreements are valid and binding agreements and obligations of the Debtors, (b) according to the Debtors' books and records, the amount of the Pre-Petition Indebtedness due and payable to the Agent and Lenders by the Debtors equaled approximately $62,051,487.61 (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities), plus (i) outstanding letter of credit exposure, plus (ii) other fees, costs, expenses and indemnities as provided for in the Pre-Petition Agreements, (c) the first-priority security interests in and liens upon the Pre-Petition Collateral of the Agent and Lenders are valid, perfected, enforceable and non-avoidable, (d) the Agent and Lenders' pre-petition claims against the Debtors and their respective estates are allowed and valid, enforceable and non-avoidable in the amount of the Pre-Petition Indebtedness, (e) the Debtors do not possess and may not assert any claim, counterclaim, setoff or defense of any kind or nature which would in any way affect the validity, enforceability and non-avoidability of the Pre-Petition Indebtedness and the Agent and Lenders' security interests in and liens upon the Pre-Petition Collateral or reduce or affect the obligation of the Debtors to pay the Pre-Petition Indebtedness, and (f) the Agent, Lenders and their respective agents, attorneys and employees are released and discharged from all claims and causes of action arising out of the Pre-Petition Agreements or their relationship with the Debtors prior to the entry of this Order.

10.     Notwithstanding anything to the contrary set forth in ¶9 hereof, the Agent and Lenders' security interests in and liens on the Pre-Petition Collateral do not have priority over

14

valid, perfected and non-avoidable security interests in and liens on the Debtors' property existing on the Petition Date and having priority over the pre-petition security interests and liens of the Lenders, including, without limitation, claims asserted by creditors with a "purchase money security interest" (as that term is used §9-103 of the Uniform Commercial Code) (the "PMSI Creditors"). The security interests and liens granted by this Order to the Lenders shall, to the extent that any of the PMSI Creditors have a valid, enforceable, properly perfected, unavoidable prepetition lien and security interest in the Pre-Petition Collateral having priority over the pre-petition security interests and liens of the Agent and the Lenders, be a lien and security interest in the Pre-Petition Collateral, junior in priority only to such liens and security interests pursuant to Section 364(c)(3) of the Bankruptcy Code.

11.     The Stipulations set forth in this Order and the extent, validity, perfection, priority and enforceability of the Agent and Lenders' liens on the Pre-Petition Collateral or any other claims whatsoever against the Agent or the Lenders, including any claims arising from or related to the fees, charges, interest, commissions and expenses charged by the Agent and Lenders prior to the Petition Date pursuant to the terms of the Pre-Petition Agreements, are for all purposes binding upon all parties in interest, unless (a) a party in interest (other than the Debtors, the Loan Parties and their respective direct and indirect shareholders) has properly commenced an adversary proceeding with respect to the foregoing on or before September 23, 2009 (or such later date agreed to in writing by the Lenders, the "Challenge Period"); provided, however, that in the event an auction of substantially all of the Debtors' assets is conducted prior to such date, the Agent and the Lenders may, pursuant to Bankruptcy Code §363(k), "credit bid" at such sale in accordance with the procedures governing the Sale Process; and (b) an Order is entered ruling in favor of the plaintiff in any such timely and properly filed adversary proceeding and as to

15

which no stay has been entered and which has not been reversed, modified, vacated or overturned. If no such adversary proceeding is properly commenced prior to the expiration of the Challenge Period, the Stipulations set forth herein, the Pre-Petition Indebtedness and the Agent and the Lenders' security interests and liens in the Pre-Petition Collateral, shall be recognized as valid, binding and in full force and effect, not subject to defense, counterclaim, or offset of any kind, upon all parties in this proceeding, including, without limitation, the Committee, any chapter 7 or chapter 11 trustee (or any successor chapter 7 or chapter 11 trustee) appointed hereafter, allowed as a fully secured claim pursuant to §§506(a) and (b) of the Bankruptcy Code, without further Order of this Court and all parties in interest shall forever be barred from asserting any claims against the Lenders (or any one of them).

### Fees and Costs of Lenders and Professionals Retained by the Estate

12. The Debtors are authorized and directed, without further Order of this Court, to promptly pay or reimburse Agent and the Lenders for all reasonable present and future fees, costs and expenses paid or incurred by the Lenders (including, without limitation, any fees and expenses of the Lenders' counsel, auditors, appraisers, accountants, etc.) respecting the filing of the Chapter 11 Cases, including, without limitation, respecting the financing transactions contemplated by this Order (including, without limitation, reasonable fees, costs and expenses incurred prior to the Petition Date). The Lenders may continue to advance such reasonable costs, fees and expenses, and accordingly, all such reasonable costs, fees and expenses may be included as part of the principal amount of the Post-Petition Indebtedness. Subject to the Agents discretion, the reimbursement contemplated hereby may be made by deducting such amounts from collections received by the Agent and Lenders or by adding such amounts to the Post-Petition Indebtedness.

CHICAGO/#1957218.12

13.     The liens and Superpriority Claims granted to the Agent and the Lenders pursuant to this Order and the Pre-Petition Agreements shall be subject and subordinate to the "Carve-Out." For purposes hereof, the "Carve Out" shall mean: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; and (ii) to the extent not otherwise payable from proceeds of Pre-Petition Collateral or Post-Petition Collateral, all allowed fees and expenses incurred in the Chapter 11 Cases by professionals retained by the Debtors or by the Committee (collectively, the "Retained Professionals") and individual Committee members in amount not to exceed the sum of (A) (1) all allowed fees and expenses incurred by the Retained Professionals prior to the occurrence of the Termination Date (defined below) (whether allowed before or after the Termination Date), and (2) individual Committee members accrued and unpaid expenses incurred prior to the occurrence of the Termination Date, in both cases not to exceed the amounts set forth in the Budget, plus (B) after the occurrence of the Termination Date, an amount not to exceed the lesser of the remaining availability under the Post-Petition Financing or $100,000 in the aggregate, less (C) (1) unapplied pre-petition retainers, and (2) the amounts allowed and paid to such Retained Professionals in the Chapter 11 Cases (including, without limitation, from the Professional Fee Account (defined below)). To facilitate the payment to the Retained Professionals, the Debtors are authorized and directed to deposit into an account maintained by Debtors' counsel an amount equal to the line items identified in the Budget under "Professional Expenses" (such account, the "Professional Fee Account"). Proceeds deposited into the Professional Fee Account shall be held solely for purposes of paying allowed fees and costs of the Retained Professionals pursuant to Order(s) of this Court. Any portion of the Professional Fee Account not used to pay allowed fees and costs of the Retained Professionals shall be held

17

by the Debtor's counsel as collateral for the Post-Petition Indebtedness. The foregoing amounts may be paid from the Professional Fee Account, notwithstanding a Termination Event or the expiration of the Term.

14. Subject to the entry of the Final Order and except for the Carve-Out, no costs and expenses incurred in connection with the administration of the Debtor's chapter 11 case or any conversion of the Debtor's chapter 11 case pursuant to Bankruptcy Code §1112, or in any future proceedings or cases related hereto, whether incurred pursuant to Bankruptcy Code §726(b) or otherwise, shall be charged against the Pre-Petition Indebtedness, the Post-Petition Indebtedness, the Pre-Petition Collateral or the Post-Petition Collateral, pursuant to Bankruptcy Code §506(c) without the express written consent of the Lenders. Subject to the entry of the Final Order, the Debtors, for themselves and their respective estates, shall be deemed to waive and may not assert, rights, claims and benefits under §552(b) of the Bankruptcy Code.

15. Neither the Post-Petition Financing or the Carve Out may be used to (a) contest, hinder or delay the Lenders' enforcement of this Order or the Lenders' realization upon any of the Pre-Petition Collateral or Post-Petition Collateral (subject to the terms of this Order); (b) obtain or negotiate the terms of indebtedness other than the Post-Petition Indebtedness; (c) prosecute any claim or action, the primary purpose of which is to invalidate, set aside avoid or subordinate, in whole or in part, the Pre-Petition Indebtedness or the Post-Petition Indebtedness, Agent and Lenders' security interests in the Pre-Petition Collateral or Post-Petition Collateral; (d) object to, contest or raise any defense to the validity, perfection, priority, extent or enforceability of the Pre-Petition Indebtedness, the Post-Petition Indebtedness, Agent and Lenders' security interests in the Pre-Petition Collateral or Post-Petition Collateral; or (e) assert any claims, counterclaims, defenses or causes of action against the Agent or the Lenders.

CHICAGO/#1957218.12

Notwithstanding anything herein to the contrary, no Loans, Collateral, Cash Collateral, or any portion of the Carve-Out may be used to prosecute, object to or contest in any manner, or raise any defenses to, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Indebtedness or Post-Petition Indebtedness or the liens securing the Pre-Petition Indebtedness or Post-Petition Indebtedness, or to prosecute or assert any claims or causes of action against the Lenders; provided, however, the Committee may use up to $25,000 of such amounts to investigate any claims or causes of action against the Agent and/or the Lenders respecting the Pre-Petition Indebtedness or Post-Petition Indebtedness or the liens securing the Pre-Petition Indebtedness or Post-Petition Indebtedness, or to prosecute or assert any claims or causes of action against the Agent and/or the Lenders. Nothing herein shall be construed as consent to the allowance of any fees and expenses of any professional retained in the Chapter 11 Cases, or shall affect the rights of the Lenders or any other interested party to object to the allowance and payment of such fees and expenses.

## Use of Cash Collateral; Adequate Protection

16.     The Debtors' cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is Cash Collateral of the Lenders within the meaning of Bankruptcy Code § 363(a). The Lenders are entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of their interest in the Pre-Petition Collateral, including for the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than Cash Collateral), and for the imposition of the automatic stay to the extent not otherwise relieved herein. Accordingly, upon entry of this Order, the Debtors are hereby authorized to use Cash Collateral, provided the Lenders are granted adequate protection for any diminution in the value of the Pre-Petition Collateral resulting from (a) the liens and security interests granted by the Post-Petition Financing and this Order or otherwise pursuant to Bankruptcy Code § 364(d), (b) the Debtor's use of Cash

19

Collateral pursuant to Bankruptcy Code § 363(c), (c) the use, sale or lease of the Lenders' collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (d) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a). Accordingly, at all times prior to the Termination Date, the Debtors shall pay to the Agent (for the benefit of the Lenders), when due, interest on that portion of the Pre-Petition Indebtedness consisting of Revolving Loans (regardless of whether such amounts appear in the Budget) at the applicable non-default rate in existence as of the Petition Date. Additionally, the Lenders shall be and hereby are granted:

    (i)    effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise, valid and perfected, replacement security interests in, and liens on (the "Replacement Liens"), all of the Debtors' right, title and interest in, to and under the Collateral, subject only to (x) the Liens granted pursuant to this Order, the Post-Petition Amendment and the Pre-Petition Agreements to the Lenders to secure the Post-Petition Indebtedness; (y) any Prior Permitted Liens (after giving effect to this Order) prior in interest and senior to the Liens granted to the Lenders pursuant to this Order and the Pre-Petition Agreements and (z) the Carve-Out and the statutory fees of the Office of the United States Trustee; and

    (ii)    pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to (x) the Superpriority Claims granted pursuant to this Order to the Lenders in respect of the Post-Petition Financing; and (y) the Carve-Out and the statutory fees of the Office of the United States Trustee.

17. Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Lenders; provided, however, that nothing herein contained shall affect or impair the Lenders' right to seek additional adequate protection of its interests.

## Events of Default; Remedies

18. If a Default or an Event of Default (as defined in any of the Operative Documents) occurs, the Lenders shall have the right to immediately suspend funding under Post-

Petition Financing and upon the Agent providing three (3) business days written notice to the Debtors, the office of the United States Trustee, and the Committee (once formed) ("Default Notice"), the Agent and the Lenders may terminate the Post-Petition Financing facility (the date of any such termination, the "Termination Date") and declare the Loans to be immediately due and payable, and the automatic stay pursuant to Bankruptcy Code §362(a) shall be deemed lifted and modified, without further Order of the Court, to permit the Agent and the Lenders to exercise any and all of their rights and remedies under the Operative Documents; provided, however, the obligations and rights of the Agent, the Lenders and the Debtors with respect to all transactions which have occurred prior to the Termination Date (including the obligation to satisfy the Carve-Out) shall remain unimpaired and unaffected by any such termination and shall survive such termination; and provided further, upon such termination, the Agent and the Lenders shall be deemed to have retained all of their rights and remedies, including, without limitation, as provided in the Operative Documents, applicable law and under the Bankruptcy Code. Upon the Debtors' receipt of a Default Notice, they shall immediately cease making any disbursements pursuant to the Budget or otherwise, except the Carve-Out, subject to further order of the Court after notice and a hearing. The Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date; provided, however, that subsequent to the issuance of the Default Notice, the Debtors and the Committee may seek entry of an Order after notice and hearing allowing use of Cash Collateral and prohibiting the Agent and the Lenders from taking the actions contemplated in this paragraph; but the Court shall only grant such relief upon a finding that no Default or Event of Default exists.

19.     An Event of Default under this Order shall include: (i) the entry of an order dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to Chapter

21

7 cases, (ii) the entry of an order appointing a Chapter 11 trustee in any of these Chapter 11 Cases, (iii) the entry of an order granting a superpriority claim or lien (other than a Prior Permitted Lien) equal or superior to the claims and liens granted to the Lender without the Lenders' prior written consent; (iv) the entry of an order staying, reversing, vacating or otherwise modifying the Post-Petition Financing under this Order (except as modified in a final order acceptable to the Agent and the Lenders) without the Lenders' prior written consent, (v) the entry of an order in any of these Chapter 11 Cases appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4), (vi) an Event of Default or Default under the Pre-Petition Agreements (as modified by the Post-Petition Amendment) or the Post-Petition Amendment, (vii) any material representation or material warranty by the Debtors that is incorrect or misleading in any material respect when made, (viii) the occurrence of a post-petition, material adverse change in the operation of the Debtors' business, (ix) the entry of any order granting any relief from the automatic stay allowing a third party to proceed against any material asset or assets of the Debtors (including, without limitation, the exercise of setoff rights), other than relating to assets subject to Prior Permitted Liens which if granted will not materially or adversely affect current operations, (x) the commencement of any actions adverse to the Lenders or their rights and remedies under this Order, the Final Order approving this Motion, or any other Bankruptcy Court order (not including an objection to the Final Order), (xi) the entry of an order confirming a plan of reorganization in these Chapter 11 Cases, unless such plan provides for payment in full, in cash, of all Pre-Petition Indebtedness and Post-Petition Indebtedness on or before the effective date of such the plan, (xii) the Debtor's failure to retain (prior to the Final Hearing) a CRO reasonably acceptable to the Lenders through the conclusion of the Sale Process, (xiii) the expenditures of the Debtors exceed, or the collections are less than

(subject to the variances set forth in ¶5 hereof), the amounts set forth in the Budget, (xiv) any other failure of the Debtors to perform in any material respect any of their obligations pursuant to this Order, including, without limitation, failure to make payments to the Lenders contemplated in the Budget or in the Order; (xv) the Debtors' filing, without the express written consent of the Lenders, of (i) a motion for the use of Cash Collateral, (ii) a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to the Agent and the Lenders under this Order or (B) secured by a security interest or lien with priority equal or superior to the priority of the Lenders' security interests in or liens on the Pre-Petition Collateral and the Post-Petition Collateral; and (xvi) the Debtor's failure to meet the following sale milestones, subject to the Court's schedule: (i) August 3, 2009: retention of an investment banker acceptable to the Lenders; (ii) August 17, 2009: Bankruptcy Court's entry of an order approving bid procedures governing the Sale Process reasonably acceptable to the Lenders ; (iii) September 18, 2009: Bankruptcy Court approval of a sale(s) of substantially all of the Debtor's assets; and (v) September 30, 2009: closing of the sale(s) of the business, either as a single enterprise or on a plant-by-plant basis. The term "Default" herein means the occurrence of any event which except for the passage of time or the giving of notice or both would constitute an Event of Default (as defined in the Pre-Petition Agreements or in this Order).

### Miscellaneous Provisions

20.     The Lenders are hereby granted relief from the automatic stay as of the Petition Date to allow them to apply the proceeds of accounts receivable and other Collateral to the Post-Petition Indebtedness as follows:

      a.     first, to the payment of all costs, fees and expenses, including attorneys' fees of the Agent and the Lenders;

b.       second, to the payment of all other Post-Petition Indebtedness other than principal, including all accrued and accruing interest; and

c.       third, to the payment of the Post-Petition Indebtedness consisting of principal.

In the event that, after application of such amounts, the Post-Petition Indebtedness is reduced to zero, Agent shall retain such funds in a "suspense account" titled in the Agent's name and shall thereafter apply such funds to any subsequently made Loans in accordance with the terms hereof. In the event that, subsequent to the Termination Date, the Post-Petition Indebtedness is fully paid and there are funds in such suspense account, the funds shall be applied against the Pre-Petition Indebtedness.

21.      In the event of a sale of substantially all of the Debtors' assets (pursuant to the Sale Process, liquidation or otherwise), the Post-Petition Indebtedness shall be paid, in full, prior to any distribution being made on account of the Pre-Petition Indebtedness.

22.      If in the course of these Chapter 11 Cases, the Court grants liens or security interests to others pursuant to Bankruptcy Code § 364(d) or any other provision of the Bankruptcy Code, which liens or security interests are senior or equal to the liens or security interests of the Lenders in the Collateral (collectively, "Subsequent Liens"), any proceeds of loans or extensions of credit secured by such Subsequent Liens shall be applied first to payment of the Pre-Petition Indebtedness, including all interest, attorneys' fees, costs and expenses, and then to the Post-Petition Indebtedness. Agent and Lenders shall retain all liens and security interests on the Collateral until all of the Pre-Petition Indebtedness is paid in full,

23.      The Debtors shall continue its cash management system with the Lenders, which shall include a lockbox/blocked account agreement in a form and substance reasonably

acceptable to the Lenders, pursuant to which the Lenders will have full dominion and control over Cash Collateral and the cash proceeds of the Collateral. The Debtors shall, as part of its "first day Motions" seek entry of an Order, in form and substance reasonably satisfactory to the Lenders, authorizing the Debtors to continue using its existing cash management system.

24. Immediately upon the entry of this Order, the Debtors shall account to the Lenders for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the Pre-Petition Collateral in the Debtor's possession, custody or control. All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtors (collectively, "Cash Proceeds") currently in the possession of the Debtor or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of the Pre-Petition Collateral. All Cash Proceeds shall be used by the Debtors in accordance with the terms of this Order.

25. The agreement by the Lenders to make any Post-Petition Financing available to the Debtors under the Pre-Petition Agreements, Post-Petition Amendment and to allow the use of Cash Collateral pursuant to the terms of this Order shall continue until the earlier of (a) the conclusion of the Final Hearing, (b) the date all Pre-Petition Indebtedness and Post-Petition Indebtedness is repaid in full, and (c) August 19, 2009 (the "Term"), unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms of the Pre-Petition Agreements or this Order.

26. The Debtors are hereby required to deliver to the Lenders such other financial and other information concerning the business and affairs of the Debtor as the Lenders shall reasonably request from time to time, including, without limitation, the financial reports and

information provided to the Lenders under the Pre-Petition Agreements, as well as all material documents relating to the Sale Process or other form of restructuring (including without limitation, solicitation materials, disclosure statements, solicitation for new financing, valuations, business plans, sale materials and projections) provided to third parties at such time as such documents and information are provided to such third parties, as well as such other information reasonably requested by the Lenders. The Debtors shall fully cooperate with and permit the Lenders to perform physical inventories of all assets in the Debtors' facilities at any reasonable times requested by the Lenders. The Debtors shall further provide the Lenders, upon request, with (a) detailed information as to the extent and composition of the Pre-Petition Collateral and Post-Petition Collateral and any collections thereon; (b) a daily report, with information reasonably satisfactory to the Lenders, identifying and differentiating accounts receivable; (c) a weekly collections report (including reports of sales); (d) a weekly variance report of actual expenditures versus Budget expenditures; and (e) a weekly borrowing base certificate in the form currently used by the Debtors.

27.     Having been found to be extending credit and making Loans to the Debtors in good faith, the Lenders shall be entitled to the full protection of Bankruptcy Code § 364(e) with respect to the Post-Petition Financing and the liens and priorities created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtors to the Lenders incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all loans made pursuant to this Order, all use of cash collateral and all Post-Petition Financing incurred by the Debtor pursuant hereto or the Pre-Petition Agreements prior to written notice to the Lenders of

26

the effective date of any such stay, modification, reversal or vacation, shall be governed in all respects by the provisions hereof and the Lenders shall be entitled to all the rights, privileges and benefits of this Order, including without limitation, the liens, Replacement Liens and Superpriority Claims granted herein.

28.     The transactions contemplated by the Post-Petition Financing are not intended to provide the Lenders with sufficient control over the Debtors so as to subject the Lenders to any liability (including, without limitation, environmental liability as an "owner," "operator," or "responsible person" as those terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorizations Act of 1986) in connection with the management of The Debtor's business or any of the Debtor's properties.  By providing the Post-Petition Financing or taking any actions pursuant to this Order, the Lenders shall not: (1) be deemed to be in control of the operations or liquidation of the Debtor; or (2) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or liquidation of the Debtors.

29.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered including without limitation (a) converting any of the Chapter 11 Cases to Chapter 7; or (b) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Order as well as the Superpriority Claims, liens and Replacement Liens granted pursuant to this Order, and the Pre-Petition Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, liens and Replacement Liens shall maintain their priority as provided by this Order until all Pre-Petition Indebtedness and Post-Petition Indebtedness is indefeasibly paid in full and discharged.

CHICAGO/#1957218.12

30.     The Lenders' obligations under this Order are subject to delivery to the Lenders of evidence satisfactory to the Lenders that the Collateral is insured for the full replacement value thereof and the Lenders are named as loss payee and/or as additional insured on all insurance policies upon request of the Lenders.

31.     The Agent and Lenders may retain a restructuring consultant or additional third party consultants or experts to review matters pertaining to the business and properties of the Debtors (including, without limitation, the value of the Debtors' businesses) each at the Debtors' expense (collectively, the "Lenders' Consultants").  The Debtors will permit the Lenders' Consultants to examine the respective corporate, financial and operating records, and, at the Debtors' expense and at reasonable times, make copies thereof, inspect the assets, properties, operations and affairs of the Debtors, visit any or all of the offices of the Debtors to discuss such matters with their officers, independent auditors, accountants or consultants (and the Debtors hereby authorizes such independent auditors, accountants and consultant to discuss such matters with the Lenders' Consultants), and the Debtors will cooperate with the Lenders' Consultants in all reasonable respects.

32.     In consideration for the Post-Petition Financing, each of the Debtors, on behalf of itself and its successors and assigns (collectively, the "Releasors"), but without prejudice to the rights of other parties in interest to assert claims, if any, on behalf of the Debtors' estates in accordance with ¶11 hereof, shall forever release, discharge and acquit the Agent and the Lenders and their respective officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or

defenses, which arose on or prior to the date this Order is entered with respect to the Debtors, the Pre-Petition Indebtedness, the Pre-Petition Agreements, the Post-Petition Indebtedness or the Post-Petition Financing; provided, however, the foregoing release shall not release the Lenders from their obligations under this Order.

33.     Entry of this Order shall be without prejudice to (a) any and all rights, remedies, claims and causes of action which the Lenders may have against the Debtors or any third parties, including, without limitation, any guarantor of the Debtors' obligations to the Lenders, (b) the right of the Lenders to seek further relief from the automatic stay in effect pursuant to Bankruptcy Code § 362, or any other relief in these Chapter 11 Cases.  The provisions of this Order shall be binding upon and inure to the benefit of the Lenders and their successors and assigns, the Debtors and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these cases as a legal representative of the Debtors or their respective estates.

34.     Except as otherwise provided herein, the terms of this Order shall be valid and binding upon the Debtors, all of their respective creditors, and all other parties in interest from and after the date of this Order.  In the event this Court modifies any of the provisions of this Order or the Pre-Petition Agreements following such further hearing, such modifications shall not affect the rights and priorities of the Lenders pursuant to this Order with respect to the Pre-Petition Collateral, Post-Petition Collateral and any portion of the Post-Petition Financing which arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Order shall remain in full force and effect except as specifically amended or modified at such final hearing.

CHICAGO/#1957218.12

35.     To the extent there exists any conflict between the Pre-Petition Agreements and the terms of this Order, this Order shall govern. To the extent there exists any conflict between the Post-Petition Amendment and the terms of this Order, the Post-Petition Amendment shall govern.

36.     The Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

37.     The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Pre-Petition Agreements, as the Lenders may reasonably require, as evidence of and for the protection of the Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the Lenders to effectuate the terms and conditions of this Order and the Pre-Petition Agreements.

38.     The Final Hearing on the Motion shall be heard on August ___, 2009 at ___a.m. before the Honorable _____, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, ____ Floor, Wilmington, Delaware, 19801. Following entry of this Order, the Debtors shall immediately provide a copy of this Order and notice of the Final Hearing to (i) the Notice Parties, (ii) any counsel to any Committee, and (iii) any party that has filed a request for notice in the Chapter 11 Cases. Such notice shall constitute good and sufficient notice of the Final Hearing. Such notice shall provide that any party in interest objecting to the relief requested in the Motion shall file written objections with the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware, 19801, not later than August ___, 2009 at 4:00 p.m. prevailing Eastern time, which objections shall be served so that the same are received on or before such date by: (a) counsel to the Debtors, (i) Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington,

Delaware 19801, Attn: Scott D. Cousins, Esq. And Sandra G.M. Selzer, Esq., and (ii) Greenberg Traurig, LLP, 200 Park Avenue, New York, New York, 10166, Attn: Nancy A. Mitchell, Esq. and Alan J. Brody, Esq.; (b) counsel to the Committee; (c) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware, 19801; (d) counsel to the Agent and the Lenders:, (i) Vedder Price P.C., 222 North LaSalle Street, Suite 2600, Chicago, Illinois 60601, Attn: Michael M. Eidelman, Esq. And Stephanie Hor-Chen, Esq.; and (ii) Pepper Hamilton LLP, Hercules Plaza, 1313 Market Street, Suite 5100, P.O. Box 1709, Wilmington, DE 19899-1709, Attn: David B. Stratton, Esq.; and (e) counsel to HIG, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19899, Attn: William E. Chapman, Jr., Esq. Any objections by creditors or other parties in interest to any of the provisions of this Interim Order shall be deemed waived unless filed and served in accordance with the notice on or before the close of business on such date.

39.     Copies of the Pre-Petition Agreements are available upon written request to the Agent's counsel: meidelman@vedderprice.com.

40.     The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: July __ , 2009
      Wilmington, Delaware

_____
The Honorable _____
United States Bankruptcy Judge

:

# EXHIBIT A

# POST-PETITION AMENDMENT TO LOAN AND SECURITY AGREEMENT

**THIS POST-PETITION AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "Agreement"), effective as of July 27, 2009, is made by and among Stant Holding Corp., a Delaware corporation ("Stant Holding"), Stant Corporation, a Delaware corporation ("Stant"), Standard-Thomson Corporation, a Delaware corporation ("STC"), Thomson International Corporation, a Delaware corporation ("Thomson"), Stant Manufacturing Inc., a Delaware corporation ("Stant Manufacturing"; and together with Stant Holding, Stant, STC and Thomson, each individually, a "Borrower", and collectively, jointly and severally, the "Borrowers"), Stant Parent Corp., a Delaware corporation ("Holdings"), as a Guarantor (together with the Borrowers, collectively, the "Loan Parties" and, individually, each as a "Loan Party"); GMAC Commercial Finance LLC, a Delaware limited liability company (in its individual capacity, "GMAC CF"), for itself as a Lender and as Agent (in such capacity, "Agent"); and those Lenders a party hereto.

## RECITALS:

A.      The Loan Parties, Agent and the Lenders are parties to that certain Loan and Security Agreement, dated as of June 18, 2008, as amended as of May 21, 2009, June 4, 2009 and June 29, 2009 (as amended hereby and as may be further amended, restated or otherwise modified from time to time, the "Loan Agreement"), and the other Loan Documents;

B.      Pursuant to the Loan Documents, the Lenders agreed to make certain loans and other extensions of credit available to the Borrowers, and, to secure in part such loans, extensions of credit and the other obligations under the Loan Agreement (the "Obligations"), each Loan Party has granted to Agent, for the benefit of Agent and the Lenders, a continuing security interest in, lien and mortgage in and to, and right of setoff against all of the Collateral, as defined in the Loan Agreement;

C.      The outstanding balance of the Obligations to the Lenders as of July 27, 2009, equaled approximately $62,051,487.61 (inclusive of interest, facility fees, costs, expenses, swap exposure and indemnities), plus (i) outstanding letter of credit exposure, plus (ii) other fees, costs, expenses and indemnities as provided for in the Loan Documents including without limitation other fees, costs and expenses incurred by Agent and the Lenders in connection with the Loan Documents, this Agreement, and the transactions contemplated hereby and thereby, including, without limitation, legal fees, costs and expenses required to be reimbursed pursuant to the Loan Documents;

D.      The Loan Parties have requested the Lenders to provide to Borrowers, as debtors and debtors-in-possession in the Loan Parties' Chapter 11 cases filed on July 27, 2009, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), styled *In re Stant Parent Corp., et al.*, certain debtor-in-possession financing (the "DIP Financing") substantially on the terms set forth in the Interim Order (I) Authorizing Secured Post-Petition Financing, (II) Granting Senior Liens and Superpriority Administrative Expense Status, (III) Authorizing the Debtors' Use of Cash

Collateral, (IV) Granting Limited Relief from the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief (as such Interim Order may be amended, supplemented or modified from time to time with the prior written consent of Agent, and any "final" order entered by the Bankruptcy Court which shall be in form and substance satisfactory to Agent, as such final order may be amended, supplemented or modified from time to time with the prior written consent of Agent, collectively, the "DIP Financing Order"). Lenders have agreed to this request on the condition that Loan Parties agree, for purposes of the DIP Financing only, to modify the Loan Agreement as stated herein.

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises and covenants set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **RECITALS.** The recitals to this Agreement are incorporated herein as a part of this Agreement.

2.  **DEFINITIONS.** Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Loan Agreement.

3.  **AMENDMENT TO THE LOAN AGREEMENT.** The Loan Parties, Agent and the Lenders hereby agree to amend the Loan Agreement as follows:

    (a)     The definition of "Asset Disposition" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

    ""Asset Disposition" means the disposition, whether by sale, lease, transfer, loss, damage, destruction, condemnation or otherwise, of any or all of the assets of any Loan Party or any of its Subsidiaries."

    (b)     The following definition of "Bankruptcy Court" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

    ""Bankruptcy Court" means United States Bankruptcy Court for the District of Delaware."

    (c)     The following definition of "DIP Budget" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

    ""DIP Budget" means the operative budget under which Loan Parties are operating in accordance with the DIP Financing Order."

    (d)     The following definition of "DIP Financing Order" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

    ""DIP Financing Order" means collectively (a) that certain Interim Order (I) Authorizing Secured Post-Petition Financing, (II) Granting

2

Senior Liens and Superpriority Administrative Expense Status, (III) Authorizing the Debtors' Use of Cash Collateral, (IV) Granting Limited Relief from the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief entered into in connection with Loan Parties' Chapter 11 cases filed on July 27, 2009, in the United States Bankruptcy Court for the District of Delaware, styled *In re Stant Parent Corp., et al.*, as such Interim Order may be amended, supplemented or modified from time to time with the prior written consent of Agent, and (b) any "final" order entered by the Bankruptcy Court which shall be in form and substance satisfactory to Agent, as such final order may be amended, supplemented or modified from time to time with the prior written consent of Agent."

(e)     The following definition of "DIP Financing Overadvance" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

""<u>DIP Financing Overadvance</u>" has the meaning assigned to that term in subsection 9.9."

(f)     The definition of "Material Adverse Effect" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

""<u>Material Adverse Effect</u>" means a material adverse effect upon (a) the business, operations, properties, assets or condition (financial or otherwise) of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform in any material respect its obligations under any Loan Document to which it is a party or of Agent or any Lender to enforce or collect any of the Obligations or (c) the enforceability or priority of the Agent's Liens with respect to a material portion of the Collateral. Notwithstanding the foregoing, it is understood and agreed that the filing of the Loan Parties' Chapter 11 cases filed on July 27, 2009, in the Bankruptcy Court styled *In re Stant Parent Corp., et al.* shall not be considered a Material Adverse Effect."

(g)     The definition of "Maximum Revolving Loan Amount" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

""<u>Maximum Revolving Loan Amount</u>" means, as of any date of determination, the aggregate of the Revolving Loan Commitments of all Lenders less the sum of the Letter of Credit Reserve and the Swingline Loan then outstanding."

(h)     The following definition of "Post-Petition Amendment" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

""Post-Petition Amendment" means that certain Post-Petition Amendment to Loan and Security Agreement by and among Borrowers, Holdings, Agent and the Lenders dated as of July 27, 2009."

(i)     The following definition of "Post-Petition Amendment Effective Date" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

""Post-Petition Amendment Effective Date" means July 27, 2009."

(j)     The following definition of "Pro Rata Share" is hereby added, in alphabetical order, to Section 1.1 of the Loan Agreement as follows:

""Pro Rata Share" means (a) with respect to matters relating to a particular Commitment of a Lender, the percentage obtained by dividing (i) such Commitment of that Lender by (ii) all such Commitments of all Lenders and (b) with respect to all other matters, the percentage obtained by dividing (i) the Total Loan Commitment of a Lender by (ii) the Total Loan Commitments of all Lenders, in either (a) or (b), as such percentage may be adjusted by assignments permitted pursuant to subsection 9.5; provided, however, if any Commitment is terminated pursuant to the terms hereof, then "Pro Rata Share" means the percentage obtained by dividing (x) the aggregate amount of such Lender's outstanding Loans related to such Commitment by (y) the aggregate amount of all outstanding Loans related to such Commitment; provided further, however, with respect to matters relating to the DIP Financing Overadvances (including, without limitation, each Lender's obligation to make DIP Financing Overadvances pursuant to Section 9.9), "Pro Rata Share" shall mean the percentage of such Lender's Commitment set forth on Exhibit I attached hereto and incorporated herein."

(k)     The definition of "Requisite Lenders" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

""Requisite Lenders" means Lenders, (other than a Defaulting Lender), holding or being responsible for more than 50% of the sum (without duplication) of the (a) outstanding Loans (other than the portion of DIP Financing Overadvances participated by GMAC CF, as Lender, to H.I.G. Capital Partners IV, L.P., pursuant to that certain Participation Agreement dated as of July 27, 2009 by and between H.I.G. Capital Partners IV, L.P. and GMAC CF, acknowledged by Agent), (b) Letter of Credit Reserve and (c) unutilized Commitments of all Lenders which are not Defaulting Lenders (other than the portion of such unutilized Commitments solely relating to DIP Financing Overadvances participated by GMAC, CF, as Lender, to H.I.G. Capital Partners IV, L.P. pursuant to the Participation Agreement referred to in the foregoing clause (a))."

4

(l)     The definition of "Revolving Loan Commitment" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

> ""Revolving Loan Commitment" means (a) as to any Lender, the commitment of such Lender to make Revolving Advances pursuant to subsections 2.1(A) and 9.9, and to purchase participations in Lender Letters of Credit pursuant to subsection 2.1(F) and without duplication to purchase a participation in the Swingline Loan pursuant to subsection 2.1(B) in the aggregate amount set forth on <u>Exhibit H</u> attached hereto and incorporated herein or in the most recent Assignment and Acceptance Agreement, if any, executed by such Lender, and (b) as to all Lenders, the aggregate commitment of all Lenders to make Revolving Advances and to purchase participations in Lender Letters of Credit and without duplication to purchase participations in the Swingline Loan pursuant to subsection 2.1(B)."

(m)     The following definitions in Section 1.1 of the Loan Agreement are hereby deleted in their entirety: "Revolving Loan Commitment Increase"; "Revolving Loan Commitment Increase Effective Date".

(n)     Section 2.1(A) of the Loan Agreement, Revolving Loan, is hereby deleted in its entirety and replaced with the following:

> "(A)     <u>Revolving Loan</u>.  Each Lender, severally, agrees to lend to Borrowers from time to time its Pro Rata Share of each advance under the Revolving Loan Commitment including as set forth in subsection 9.9.  The aggregate amount of the Revolving Loan Commitment shall not exceed at any time Thirty Two Million Four Hundred Eighty One Thousand Four Hundred Eighty Seven and 61/100 Dollars ($32,481,487.61).  Amounts borrowed under this subsection 2.1(A) or subsection 9.9 may be repaid and reborrowed at any time prior to the earlier of (1) the termination of the Revolving Loan Commitment pursuant to subsection 8.3 or (2) the Termination Date.  Except as otherwise provided herein, including without limitation in subsection 9.9, no Lender shall have any obligation to make a Revolving Advance to the extent such Revolving Advance would cause the Revolving Loan (after giving effect to any immediate application of the proceeds thereof) to exceed the aggregate amount of the Revolving Loan Commitments of all Lenders less the sum of the Letter of Credit Reserve and the Swingline Loan then outstanding."

(o)     Section 2.1(C) of the Loan Agreement, Term Loan, is hereby deleted in its entirety and replaced with the following:

> "(C)     <u>Term Loan</u>.  Each Lender, severally, agrees to lend to Borrowers, on the Closing Date, its Pro Rata Share of the Term Loan Commitment which is in the aggregate amount of $40,000,000. The Term Loan shall be funded in one drawing.  Amounts borrowed under this

5

subsection 2.1(C) and repaid may not be reborrowed. The Term Loan shall become immediately due and payable without notice or demand on the Termination Date."

(p) The following sentence is hereby added to the end of Section 2.2(B) of the Loan Agreement, Interest:

"From and after the Post-Petition Amendment Effective Date, the Term Loan shall not bear any interest. For the avoidance of doubt, all interest accrued on the Term Loan prior to the Post-Petition Amendment Effective Date continue to constitute Obligations."

(q) Section 2.4(B)(1) of the Loan Agreement, Over Formula Advance, is hereby deleted in its entirety and replaced with the following:

"(1) Over Formula Advance. At any time that the Revolving Loan exceeds the aggregate amount of the Revolving Loan Commitments of all Lenders less the sum of the Letter of Credit Reserve and the Swingline Loan then outstanding (an "Over Formula Advance"), Borrowers shall immediately repay the Revolving Loan and/or the Swingline Loan to the extent necessary to eliminate the Over Formula Advance."

(r) Section 2.4(B)(2) of the Loan Agreement, Prepayments from Proceeds of Asset Dispositions, is hereby deleted in its entirety and replaced with the following:

"(2) Prepayments from Proceeds of Asset Dispositions. Immediately upon receipt by Loan Parties or any of their Subsidiaries of Net Cash Proceeds of any Asset Disposition (in one or a series of related transactions), Borrowers shall prepay the Obligations in an amount equal to such Net Cash Proceeds. All such prepayments shall be applied to the Obligations in accordance with subsection 2.4(E)."

(s) Section 2.4(B)(4) of the Loan Agreement, Prepayments from Issuance of Securities, is hereby deleted in its entirety and replaced with the following:

"(4) Prepayments from Issuance of Securities and Indebtedness. Immediately upon the receipt by any Loan Party of the Net Cash Proceeds of (a) the issuance of equity securities or (b) the issuance of Indebtedness, Borrowers shall prepay the Obligations in an amount equal to such Net Cash Proceeds. All such prepayments shall be applied to the Obligations in accordance with subsection 2.4(E)."

(t) Section 2.4(E) of the Loan Agreement, Application of Prepayment Proceeds, is hereby deleted in its entirety and replaced with the following:

6

"(E)    Application of Prepayment Proceeds. With respect to the prepayments described in subsections 2.4(B)(2), 2.4(B)(3) and 2.4(B)(4)(a), such prepayments shall first be applied in payment of the DIP Financing Overadvances, and any remaining amounts shall be applied in payment of the outstanding principal balance of the Revolving Loans, and, at any time after the outstanding principal balance of the Revolving Loans shall have been repaid in full (other than indemnification Obligations not then asserted or due), such payments shall be applied in payment of the Term Loan. With respect to the prepayments described in subsections 2.4(B)(4)(b), such prepayments shall first be applied in payment of the outstanding principal balance of the Revolving Loans (other than DIP Financing Overadvances), and, at any time after the outstanding principal balance of the Revolving Loans (other than the DIP Financing Overadvances) shall have been repaid in full (other than indemnification Obligations not then asserted or due), such payments shall be applied in payment of the Term Loan, and, at any time after the Term Loan have been repaid in full (other than indemnification Obligations not then asserted or due), such payments shall be applied to reduce the outstanding principal balance of the DIP Financing Overadvances. Considering each type of Loan being prepaid separately, any such prepayment shall be applied first to Base Rate Loans of the type required to be prepaid before application to LIBOR Loans of the type required to be prepaid. After the outstanding principal balance of the Revolving Loans is reduced to zero Dollars ($0) as a result of the application of this subsection 2.4(E), any remaining amount from such prepayments (i) shall be applied to all remaining Obligations then outstanding (if any) and any balance remaining shall be delivered to Borrowers and (ii) upon the occurrence and during the continuance of an Event of Default, shall be applied in accordance with subsection 8.7 of this Agreement."

(u)    The first sentence of Section 2.5 of the Loan Agreement, Term of this Agreement, is hereby deleted in its entirety and replaced with the following:

"This Agreement shall be effective until the earlier of (a) September 30, 2009, (b) the closing of the sale of all or substantially all of the Borrowers' assets pursuant to an order from the Bankruptcy Court, (c) the date that is ten (10) days after the Bankruptcy Court's order approving a sale of all or substantially all of Borrowers' assets, and (d) the occurrence of a default or event of default under the DIP Financing Order (the "Termination Date")."

(v)    Section 2.16 of the Loan Agreement, Increase in Revolving Loan Commitment, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

7

(w)     Section 3(C) of the Loan Agreement, Closing Date Availability, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(x)     Section 3(R) of the Loan Agreement, Solvency, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(y)     Section 4.14 of the Loan Agreement, Solvency, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(z)     Section 6 of the Loan Agreement, Financial Covenants, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(aa)     The following sentence is added at the end of Section 7.8 of the Loan Agreement, Transactions with Affiliates:

"Notwithstanding the foregoing, the foregoing restrictions shall not apply to the Loan Parties entering into that certain Asset Purchase Agreement dated as of July 27, 2009 by and among the Loan Parties and Vapor Acquisition Corp. (to the extent it is an Affiliate)."

(bb)     Clause (H) of Section 8.1 of the Loan Agreement, Voluntary Bankruptcy, is hereby deleted in its entirety and replaced with the following:

"(H)     Voluntary Bankruptcy; Appointment of Receiver, etc. Except for the filing of the Loan Parties' Chapter 11 cases on July 27, 2009, in the Bankruptcy Court styled *In re Stant Parent Corp., et al.*, (1) any Loan Party commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case under any such law or consents to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or (2) any Loan Party makes any assignment for the benefit of creditors; or (3) the board of directors of any Loan Party adopts any resolution or otherwise authorizes action to approve any of the actions referred to in this subsection 8.1(H); or"

(cc)     Clause (L) of Section 8.1 of the Loan Agreement, Solvency, is hereby deleted in its entirety and replaced with the following:

"[Reserved.]"

(dd)     Section 8.1 of the Loan Agreement, Event of Default is hereby amended by adding the following immediately before the period appearing therein:

"; or (T)     DIP Financing Order.  The occurrence of any default or event of default, as each such term is defined in the DIP Financing Order, under the DIP Financing Order, or the amendment, modification or termination of such DIP Financing Order without Agent's prior written consent."

(ee)     Subpart (b) of the first sentence of Section 8.7 of the Loan Agreement, Application of Proceeds, is hereby deleted in its entirety and replaced with the following:

"(b) the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied:  first, to all fees, costs and expenses incurred by or owing to Agent and then any Lender with respect to this Agreement, the other Loan Documents (other than any Secured Hedge Agreement) or the Collateral; second, to accrued and unpaid interest on the DIP Financing Overadvances (including any interest which but for the provisions of any bankruptcy or insolvency law would have accrued on such amounts); third, to the principal amounts of the DIP Financing Overadvances outstanding (which shall not be deemed to include Obligations owed to any Lender under an Interest Rate Agreement, Secured Hedge Agreement or Currency Swap Agreement); fourth, to accrued and unpaid interest on all other Obligations (including any interest which but for the provisions of any bankruptcy or insolvency law would have accrued on such amounts); fifth, to the principal amounts of all other Obligations outstanding (other than Obligations owed to any Lender under an Interest Rate Agreement, Secured Hedge Agreement or Currency Swap Agreement); and sixth, to any other Obligations of the Loan Parties owing to Agent or any Lender under the Loan Documents, any Interest Rate Agreement, Secured Hedge Agreement or Currency Swap Agreement."

(ff)     A new paragraph is hereby inserted in Section 9.9 of the Loan Agreement, Discretionary Advances, immediately following the first paragraph, as follows:

"Notwithstanding anything contained herein to the contrary, during the period from the entry of the DIP Financing Order to the Termination Date, each Lender, severally, agrees to make Revolving Advances to Borrowers in each of such Lender's Pro Rata Shares of each Revolving Advance in an aggregate amount of not more than Eleven Million and No/100 Dollars ($11,000,000.00) (such amount referred to as the "DIP Financing Commitment Amount"), provided that the Revolving Loans do

9

not exceed the aggregate amount of the Revolving Loan Commitment less the sum of the Letter of Credit Reserve and the Swingline Loan then outstanding (the "DIP Financing Overadvances"). Notwithstanding anything contained in this Agreement to the contrary, DIP Financing Overadvances shall be requested in the manner set forth in Section 2.1(D). DIP Financing Overadvances shall be used by Borrowers to fund only the disbursements set forth in the DIP Budget (when scheduled) or as otherwise set forth in the DIP Financing Order, without regard to the Borrowing Base; provided, that Agent and Lenders' obligations to provide the DIP Financing Overadvances is expressly predicated on Loan Parties' compliance with the terms and conditions of the DIP Financing Order; provided further, Agent and the Lenders shall have no obligation to advance the DIP Financing Overadvances upon the occurrence of a default or event of default under the DIP Financing Order; provided further, all conditions set forth in Section 3 must be satisfied prior to each Revolving Advance of the DIP Financing Overadvances, provided, that each party hereto acknowledges the occurrence and continuance of the "Current Defaults", as defined and set forth in the Post-Petition Amendment, for purposes of the satisfaction of the conditions set forth in Section 3. Notwithstanding anything contained in Section 2.2(A) to the contrary, the DIP Financing Overadvances shall bear interest from the date such Revolving Advances are made to the date paid at a rate per annum equal to, in the case of LIBOR Loans, LIBOR plus five and three quarters of one percent (5.75%), and in the case of Base Rate Loans, the Base Rate plus four and three quarters of one percent (4.75%), and the interest on the DIP Financing Overadvances shall be payable to Agent for the benefit of Lenders monthly in arrears on the first day of each month, on the date of any prepayment of Loans and at maturity, whether by acceleration or otherwise. For purposes of the DIP Financing Overadvances, (a) LIBOR shall equal the greater of two and three quarters of one percent (2.75%) and the amount determined in accordance with section (ii) of the definition of "LIBOR", and (b) in no event shall the Base Rate be less than three and three quarters of one percent (3.75%).""

(gg) The addresses set forth for notice purposes of Borrowers in Section 10.3 of the Loan Agreement, Notices, are hereby deleted and replaced with the following:

If to Borrowers:  c/o H.I.G. CAPITAL, LLC
1001 Brickell Bay Drive, 27th Floor
Miami, FL 33131
Attention: Lewis Schoenwetter and Roman Krislav
Facsimile No.: (305) 379-2013
e-mail: rkrislav@higcapital.com ;
lschoenwetter@higcapital.com

|                   |                                              |
|-------------------|----------------------------------------------|
| With a copy to:   | KIRKLAND & ELLIS LLP                         |
|                   | 200 E. Randolph Drive                        |
|                   | Chicago, IL 60601                            |
|                   | Attention: Michael Weed & Andres Mena        |
|                   | Facsimile No.: (312) 862-2200                |
|                   | e-mail: mweed@kirkland.com ,                 |
|                   | amena@kirkland.com                           |
|                   |                                              |
| And a copy to:    | GREENBERG TRAURIG LLP                        |
|                   | 200 Park Avenue                              |
|                   | New York, NY 10166                           |
|                   | Attention: Nancy A. Mitchell                 |
|                   | Facsimile No.: 212.801.6400                  |
|                   | e-mail: mitchelln@gtlaw.com                  |

(hh)    The parties hereto acknowledge and agree no other Loans, Lender Letters of Credit, Swingline Advances, or other Advances or overadvances under the Revolving Loan Commitment shall be available to Borrowers other than the DIP Financing Overadvances.  The parties hereto furthermore acknowledge and agree that notwithstanding anything contained in the Loan Agreement to the contrary, (A) the Interest Period for LIBOR Loans of the DIP Financing Overadvances shall be either a (1) one or (2) two month period, (B) there shall be no more than two (2) Interest Periods relating to LIBOR Loans of the DIP Financing Overadvances outstanding at any time and (C) no Interest Period shall extend beyond the Termination Date.

(ii)    Exhibit H, "Revolving Loan Commitment Amounts", attached hereto as Annex A, shall be attached to and incorporated in the Loan Agreement.

(jj)    Exhibit I, "Pro Rata Share for DIP Financing Overadvances", attached hereto as Annex B, shall be attached to and incorporated in the Loan Agreement.

**4.     EFFECTUATION**.  This Amendment shall not become effective until Agent shall have received:

(a)    from each party hereto, either a counterpart of this Amendment signed on behalf of such party or written evidence reasonably satisfactory to Agent (which may include telecopy or electronic transmission of a signed signature page of this Amendment) that such party has signed a counterpart of this Amendment;

(b)    a fully executed Participation Agreement from H.I.G. Capital Partners IV, L.P. with GMAC CF, as Lender, and acknowledged by Agent, in form and substance satisfactory to Agent and GMAC CF, as Lender, in the sole discretion of each of Agent and GMAC CF, as Lender (the "Participation Agreement"), pursuant to which H.I.G. Capital Partners IV, L.P. shall purchase a $6,000,000 participation in the DIP Financing Overadvances from GMAC CF, as Lender;

(c) $6,000,000 in immediately available funds in the "Participation Account" (as such term is defined in the Participation Agreement) from H.I.G. Capital Partners IV, L.P.;

(d) Amended and Restated Revolving Loan Notes in favor of each Lender for such Lender's Revolving Loan Commitment as amended hereby, each in form and substance satisfactory to such Lender; and

(e) A true, correct and complete copy of the DIP Financing Order and the DIP Budget approved by the Bankruptcy Court, as certified by Borrower Representative, each of which is in form and substance satisfactory to Agent.

5. **REPRESENTATIONS AND WARRANTIES.** Each Loan Party's representations and warranties contained in this Agreement shall survive the execution, delivery and acceptance of this Agreement by Agent and the Lenders. Each Loan Party represents and warrants to Agent and the Lenders that:

(a) The execution and delivery of this Agreement and the performance by each Loan Party of its obligations hereunder are within each Loan Party's organizational powers and authority, have been duly authorized by all necessary organizational action and do not and will not contravene or conflict with the organizational documents or material contracts of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes the legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar law affecting creditors' rights generally;

(b) Except for the approval of the Bankruptcy Court, no consent, order, qualification, validation, license, approval or authorization of, or filing, recording, registration or declaration with, or other action in respect of, any governmental body, authority, bureau or agency or other Person is required in connection with the execution, delivery or performance of, or the legality, validity, binding effect or enforceability of, this Agreement;

(c) The execution, delivery and performance of this Agreement by each Loan Party does not and will not violate any law, governmental regulation, judgment, order or decree applicable to such Loan Party and does not and will not violate the provisions of, or constitute a default or any event of default under, or result in the creation of any security interest or lien upon any property of such Loan Party pursuant to any indenture, mortgage, instrument, contract, agreement or other undertaking to which such Loan Party is party or is subject to or by which such Loan Party or any of their real or personal property may be bound; and

(d) No Event of Default or Defaults exist under the Loan Documents other than the Events of Default and Defaults identified on Annex C attached hereto (collectively, the "Current Defaults") as of the date of this Agreement, and each Loan Party acknowledges the existence and continuance of such Current Defaults.

12

6.     **RATIFICATION**. The Loan Parties acknowledge and agree that, except as expressly set forth herein, all of the terms and conditions of and their obligations under the Loan Agreement and other Loan Documents are hereby ratified and confirmed and continue unchanged and in full force and effect. Each Loan Party hereby confirms and agrees that all security interests and Liens granted to Agent for its benefit and for the ratable benefit of each Lender continue in full force and effect and shall continue to secure the Obligations. Each Loan Party hereby acknowledges and reaffirms that Agent and Lenders maintain valid, properly perfected, first priority fully enforceable security interests in and liens (subject to Permitted Encumbrances) on all of the Collateral described in the Loan Documents. All references to the Loan Agreement shall mean the Loan Agreement as modified by this Agreement. Holdings hereby agrees that the Guaranty remains in full force and effect, and Holdings hereby ratifies and affirms all of its obligations under the Guaranty, as set forth in the Guaranty.

7.     **NO WAIVER.** Agent's and/or the Lenders' failure at any time to require strict performance by any Loan Party of any provision or term of the Loan Documents or this Agreement shall not waive, affect or diminish any right of Agent and the Lenders thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Agent and/or the Lenders of any Event of Default shall not, except as may be expressly set forth herein, suspend, waive or affect any Event of Default, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. None of the undertakings, agreements, warranties, covenants and representations of any Loan Party contained in this Agreement or the Loan Documents, and no Event of Default shall be deemed to have been suspended or waived by Agent or the Lenders unless such suspension or waiver is (a) in writing and signed by Agent and the Requisite Lenders, and (b) delivered to the Loan Parties.

8.     **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon Agent and the Lenders and their respective successors and assigns, and shall be binding on each Loan Party and its successors and assigns.

9.     **LIMITATION ON RELATIONSHIP BETWEEN PARTIES.** The relationship of the Lenders, on the one hand, and the Loan Parties, on the other hand, has been and shall continue to be, at all times, that of creditors and debtors and not as joint venturers or partners. Nothing contained in this Agreement, any instrument, document or agreement delivered in connection herewith or in the Loan Documents shall be deemed or construed to create a fiduciary relationship between or among the parties.

10.     **SECTION TITLES.** The Section titles contained in this Agreement are included for the sake of convenience only, shall be without substantive meaning or content of any kind whatsoever, and are not a part of the agreement among the parties.

11.     **NOTICES.** Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto to be effective shall be provided in accordance with Section 10.3 of the Loan Agreement.

CHICAGO/#1958896.14

12.     **EXECUTION IN COUNTERPARTS/FACSIMILE.**  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Facsimile signatures shall be binding on the parties.

13.     **INTEGRATION.**  This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof; provided, however, that except as expressly modified herein, the Loan Documents shall remain in full force and effect in accordance with their respective terms and conditions.

14.     **TIME OF ESSENCE.**  Time is of the essence in this Agreement and the Loan Documents.

15.     **FINANCING DOCUMENT.**  This Agreement shall constitute a "Loan Document" for purposes of the Loan Agreement and all other Loan Documents.

*(Signature pages follow.)*

14

*(Signature Page to Post-Petition Amendment to Loan and Security Agreement)*

IN WITNESS WHEREOF, the parties hereto have duly executed this Post-Petition Amendment to Loan and Security Agreement as of the date first above written.

**BORROWERS:**

**STANT HOLDING CORP.,** a Delaware corporation

By: *Marlon J Bailey*
Name: Marlon J. Bailey
Title:   President & CEO


**STANDARD-THOMSON CORPORATION,** a Delaware corporation

By: *Marlon J Bailey*
Name: Marlon J. Bailey
Title:   President & CEO


**THOMSON INTERNATIONAL CORPORATION,** a Delaware corporation

By: *Marlon J Bailey*
Name: Marlon J. Bailey
Title:   President & CEO


**STANT MANUFACTURING INC.,** a Delaware corporation

By: *Marlon J Bailey*
Name: Marlon J. Bailey
Title:   President & CEO


**STANT CORPORATION,** a Delaware corporation

By: *Marlon J Bailey*
Name: Marlon J. Bailey
Title:   President & CEO

*(Signature Page to Post-Petition Amendment to Loan and Security Agreement)*

**HOLDINGS:**

**STANT PARENT CORP.**, a Delaware corporation

By: _Marlon J Bailey_
Name: Marlon J. Bailey
Title: President & CEO

AGENT AND A LENDER:                    **GMAC COMMERCIAL FINANCE LLC**

By: _____

Name:  Thomas Brent

Title:  Director

LENDERS:                                 **RBS CITIZENS, NATIONAL ASSOCIATION**

By: _____

Name: _____

Title: _____

**ING CAPITAL LLC**

By: _____

Name:  Lawrence P. Eyink

Title:  Director

**THE HUNTINGTON NATIONAL BANK**

By: _____

Name:  James A. Woodward

Title:  Vice President

*(Signature Page to Post-Petition Amendment to Loan and Security Agreement)*

AGENT AND A LENDER:

**GMAC COMMERCIAL FINANCE LLC**

By:_____
Name: Thomas Brent
Title: Director

LENDERS:

**RBS CITIZENS, NATIONAL ASSOCIATION**

By:_____
Name: ~~Patrick C. Joyce~~
Title: ~~Senior Vice President~~

**ING CAPITAL LLC**

By:_____
Name: Lawrence P. Eyink
Title: Director

**THE HUNTINGTON NATIONAL BANK**

By:_____
Name: James A. Woodward
Title: Vice President

*(Signature Page to Post-Petition Amendment to Loan and Security Agreement)*

**AGENT AND A LENDER:**                 **GMAC COMMERCIAL FINANCE LLC**

By:_____
Name:  Thomas Brent
Title:    Director

**LENDERS:**                            **RBS CITIZENS, NATIONAL ASSOCIATION**

By:_____
Name: _____
Title:  _____

**ING CAPITAL LLC**

By:_____
Name:  Lawrence P. Eyink
Title:    Director

**THE HUNTINGTON NATIONAL BANK**

By:_____
Name:  James A. Woodward
Title:    Vice President

CHICAGO/#1958896

**AGENT AND A LENDER:**                    **GMAC COMMERCIAL FINANCE LLC**

By:_____
Name: Thomas Brent
Title:   Director

**LENDERS:**                               **RBS CITIZENS, NATIONAL ASSOCIATION**

By:_____
Name: _____
Title: _____

**ING CAPITAL LLC**

By:_____
Name: Lawrence P. Eyink
Title:   Director

**THE HUNTINGTON NATIONAL BANK**

By:_____
Name: James A. Woodward
Title:   Vice President

## ANNEX A

## EXHIBIT H TO LOAN AGREEMENT

Revolving Loan Commitment

**GMAC COMMERCIAL FINANCE LLC**          $15,457,674.15

**RBS CITIZENS, NATIONAL
ASSOCIATION**          $7,566,139.32

**ING CAPITAL LLC**          $5,674,604.49

**THE HUNTINGTON NATIONAL BANK**          $3,783,069.66

# ANNEX B

## EXHIBIT I TO LOAN AGREEMENT

Pro Rata Share for DIP Financing Overadvances

**GMAC COMMERCIAL FINANCE LLC**    $7,785,714.29

**RBS CITIZENS, NATIONAL ASSOCIATION**    $1,428,571.43

**ING CAPITAL LLC**    $1,071,428.57

**THE HUNTINGTON NATIONAL BANK**    $714,285.71

# ANNEX C

## CURRENT DEFAULTS

1.      Failure of the Loan Parties to maintain the required minimum EBITDA set forth in subsection (A) of the Financial Covenants Rider for the fiscal quarters ending January 3, 2009, April 4, 2009 and July 4, 2009.

2.      Failure of the Loan Parties to maintain the required total leverage ratio set forth in subsection (B) of the Financial Covenants Rider for the fiscal quarters ending January 3, 2009, April 4, 2009 and July 4, 2009.

3.      Failure of the Loan Parties to maintain the required senior leverage ratio set forth in subsection (C) of the Financial Covenants Rider for the fiscal quarters ending January 3, 2009, April 4, 2009 and July 4, 2009.

4.      Failure of the Loan Parties to maintain the required Fixed Charge Coverage Ratio set forth in subsection (E) of the Financial Covenants Rider for the fiscal quarter ending January 3, 2009, April 4, 2009 and July 4, 2009.

5.      Failure of the Loan Parties to deliver the annual financial statements and reports for the Fiscal Year ending January 3, 2009 in the time required in subsection 1 of the Reporting Rider, the financial statements and reports for the  fiscal quarters ending April 4, 2009 in the time required in subsections 2 of the Reporting Rider, and the financial statements and reports for the fiscal months of April and May 2009 in the time required in subsection 3 of the Reporting Rider.

6.      Failure of the Loan Parties to deliver the annual financial statements and reports for the Fiscal Year ending January 3, 2009 without qualification by the Borrowers' Accountants as required in subsection 1 of the Reporting Rider.

7.      Failure of the Loan Parties to be solvent (as represented by the Loan Parties in subsection 4.14 of the Loan Agreement) or the admittance in writing of its present or prospective inability to pay its debts as they become due, in violation of Section 8.1(L) of the Loan Agreement.

8.      Defaults or events of default under the Seller Subordinated Debt or the Subordinated Debt which are based on the same facts and circumstances giving rise to the Current Defaults, in violation of Section 8.1(B) of the Loan Agreement.

9.      Failure of the Loan Parties to pay when due interest on the Loans for the months of May and June, the unused line fee pursuant to Section 2.3(a) for the months of May and June, and the Agent's Fee as defined in that certain fee letter agreement dated as of the Closing Date among Borrowers and GMAC CF, due June 18, 2009, all in violation of Section 8.1(A) of the Loan Agreement.

10. Failure of the Loan Parties to pay when due the Scheduled Installment of the Term Loan originally scheduled for July 4, 2009, in violation of Section 8.1(A) of the Loan Agreement.

CHICAGO/#1958896.14

# EXHIBIT B

| Post-Petition Week: | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | Total | Check |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 8/1/2009 | 8/8/2009 | 8/15/2009 | 8/22/2009 | 8/29/2009 | 9/5/2009 | 9/12/2009 | 9/19/2009 | 9/26/2009 | 10/2/2009 | 10/10/2009 | | |
| Beginning Cash Balance | 9,354 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,354 | 9,354 |
| **Revenues** | | | | | | | | | | | | | |
| Net Revenues | $1,509,100 | $1,512,549 | $1,538,285 | $1,538,285 | $1,597,600 | $1,777,240 | $1,777,240 | $1,802,240 | $1,927,800 | $1,927,800 | $2,151,250 | $19,009,389 | $19,009,389 |
| **Cash Receipts** | | | | | | | | | | | | | |
| A/R Collections | 1,241,402 | 1,387,647 | 1,499,542 | 1,456,574 | 1,718,516 | 1,764,929 | 1,678,324 | 1,471,122 | 1,701,864 | 1,841,311 | 1,640,375 | 17,401,606 | 17,401,606 |
| Total Cash Receipts | 1,241,402 | 1,387,647 | 1,499,542 | 1,456,574 | 1,718,516 | 1,764,929 | 1,678,324 | 1,471,122 | 1,701,864 | 1,841,311 | 1,640,375 | 17,401,606 | $17,401,606 |
| **Cash Disbursements** | | | | | | | | | | | | | |
| **Payments** | | | | | | | | | | | | | |
| **Material Vendor Payments** | | | | | | | | | | | | | |
| Pre-Petition Critical | (1,210,064) | (996,477) | (1,016,022) | (930,722) | (637,212) | (728,190) | (791,003) | | | | | (6,309,690) | |
| Vendor Payments | (1,306,740) | (113,776) | (36,647) | (137,468) | (44,734) | (20,848) | (17,503) | | | | | (1,677,716) | |
| Sub-Total Pre-Petition | (2,516,804) | (1,110,254) | (1,052,669) | (1,068,190) | (681,945) | (749,038) | (808,505) | | | | | (7,987,406) | |
| **Post-Petition Critical** | | | | | | | | | | | | | |
| Material Vendor Payments | (312,500) | (187,500) | (187,500) | (187,500) | (125,000) | (125,000) | (125,000) | (442,430) | (504,930) | (504,930) | (317,430) | (3,013,720) | |
| Manufacturing & Warehouse | (687,765) | (739,417) | (607,403) | (232,251) | (203,825) | (1,136,084) | (188,775) | (611,687) | (229,225) | (592,802) | (741,757) | (5,970,992) | |
| Payroll & Benefits | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (610,000) | |
| CRO | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) | | | | | | | (300,000) | |
| Delivery Expense (1) | (88,650) | (86,650) | (110,000) | (128,750) | (95,650) | (75,550) | (85,500) | (100,750) | (75,900) | (75,900) | (75,900) | (910,450) | |
| Selling Expense (2) | (147,650) | (169,021) | (295,070) | (142,614) | (94,727) | (164,451) | (101,868) | (162,703) | (120,335) | (177,948) | (103,862) | (1,376,366) | |
| UCC Professionals and Expense | 0 | 0 | (1,000) | 0 | (301,977) | (95,650) | (1,000) | 0 | (367,280) | (75,900) | 0 | (671,207) | |
| G & A Expense (3) | (238,018) | (134,437) | (118,257) | (123,430) | (142,614) | (202,264) | (164,451) | (157,886) | (162,703) | (120,335) | (177,948) | (1,587,550) | |
| CAPEX | | | | | | | | | | | | | |
| **Professional Expense** | | | | | | | | | | | | | |
| Senior Lender's Counsel | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (687,500) | |
| Senior Lender's Financial Advisor | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (825,000) | |
| Debtors' Counsel | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (7,000) | (67,000) | |
| Debtors' Accountant | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | | (100,000) | |
| Investment Banker | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (165,000) | |
| UCC Professionals and Expense | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (3,125) | (34,375) | |
| Claims Agent | | | | | | | | | | | | | |
| Sub-Total | (174,125) | (174,125) | (174,125) | (174,125) | (174,125) | (174,125) | (174,125) | (174,125) | (174,125) | (164,625) | (164,625) | (1,878,875) | |
| **Professional Fees** | | | | | | | | | | | | | |
| Utility/Deposits | (75,000) | (87,035) | (4,630) | (21,630) | (22,519) | (87,035) | (4,396) | (5,064) | (23,320) | (15,665) | (80,400) | (426,695) | |
| Prepetition Interest & Fees | | | | | | | | | | | | | |
| DIP Facility Interest & Fees | (100,000) | | | | | (100,000) | | | | | (150,000) | (450,000) | |
| | (150,000) | | | | | (150,000) | | | | | (100,000) | | |
| Total Cash Disbursements | (4,076,194) | (2,832,649) | (2,501,686) | (2,282,773) | (1,931,035) | (3,036,760) | (1,804,016) | (1,643,790) | (2,322,300) | (2,248,135) | (1,709,921) | (25,389,261) | |
| Net Cash Change | (2,825,438) | (1,445,002) | (1,002,144) | (826,199) | (212,519) | (1,271,831) | (125,693) | (172,668) | 379,564 | (406,824) | (69,547) | (7,978,301) | |
| Dip Revolver Outstanding Balance | (2,825,438) | (4,270,440) | (5,272,584) | (6,098,783) | (6,311,303) | (7,583,134) | (7,708,826) | (7,881,494) | (7,501,930) | (7,908,754) | (7,978,301) | (7,978,301) | |
| DIP Revolver Available | 8,174,562 | 6,729,560 | 5,727,416 | 4,901,217 | 4,688,697 | 3,416,866 | 3,291,174 | 3,118,506 | 3,498,070 | 3,091,246 | 3,021,699 | | |

$ 11,000,000

(1) Freight on material coming to Stant and freight to move goods to customers.
(2) Includes sales and marketing promotions, commissions, programs and related administration costs.
(3) Includes ordinary course of business legal and professional fees, travel and entertainment, bad debt expense, dues and supplies.